UNITED STATES of America, ex rel.
Robert J. MERENA, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORA-
TION, Smithkline Beecham Clinical
Laboratories, Inc., Defendants.

United States of America, ex rel. Glenn
Grossenbacher, and Charles W.
Robinson, Jr., Plaintiffs,

v.

Smithkline Beecham Clinical
Laboratories, Inc.,
Defendant.

United States of America, ex rel. Kevin
J. Spear, The Berkeley Community
Law Center, Jack Dowden, Plaintiffs,

v.

Smithkline Beecham Laboratories,
Inc., Defendant.

Nos. Civ.A. 93–5974, Civ.A. 95–
6953, Civ.A. 95–6551.

United States District Court,
E.D. Pennsylvania.

April 8, 1998.

Russell B. Kinner, James E. Ward, Dept. of Justice, Civ. Div., Washington, DC, for USA.

Marc S. Raspanti, David Laigaie, Miller Alfano & Raspanti, P.C., Philadelphia, PA, for Robert J. Merena, Plaintiff.

John Clark, Rand J. Riklin, San Antonio, TX, for Robinson & Grossenbacher, Plaintiffs.

Thomas H. Lee, II, Dechert, Price & Rhoads, Philadelphia, PA, for Smithkline Beecham Corporation, defendant.

## OPINION

VanARTSDALEN, Senior District Judge.

### A. *BACKGROUND*

#### 1. *Preliminary*

The basic remaining issue for determination in this complex litigation is the amount to be awarded to the qui tam relators as their share in the proceeds obtained from the defendants in the settlement of the qui tam Civil Actions 93–5974 (Merena action), 95–6953 (Robinson action) and 95–6551 (Spear action). The Government, with the consent of all of the qui tam relators in the three enumerated actions, settled and dismissed with prejudice all three actions that had been filed by the qui tam relators against the defendants, SmithKline Beecham Corporation and SmithKline Beecham Clinical Laboratories, Inc. (SBCL). The qui tam actions were filed under the False Claims Act, 31 U.S.C. §§ 3729–3733. The total amount of the settlement was $325,000,000, plus interest that had accrued on the settlement funds that were deposited in escrow pending final settlement and dismissal of the actions. The accrued interest amounted to $8,976,266.40, making the total recovery $333,976,266.40. The Settlement Agreement expressly provided for dismissal with prejudice of the three above noted qui tam actions, the court retaining jurisdiction over enforcement of the settlement agreement and determination of attorney fees and relators' share issues. Prior to dismissal, the Government expressly and without limitation intervened in each of the actions pursuant to 31 U.S.C. § 3730(b)(4).

The statute provides that if the Government proceeds with an action brought by an individual under the qui tam statute, the qui tam relator shall "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action or settlement of the claim." 31 U.S.C. § 3730(d)(1). If that section of the statute is applicable, superficially at least, the qui tam relator/relators should be entitled to a minimum of $50,096,439.96 and a maximum of $83,494,066.60.

The separate qui tam relators (hereafter sometimes referred to as the "Consolidated Plaintiffs" or the "Relators") in all three actions have agreed among themselves as to how they will divide any qui tam share awarded to any or all of them. In addition, the Government has agreed with the Spear qui tam Relators to pay those Relators a qui tam award of 15 percent on an allocated share, including interest, of $13,297,829 of the total settlement proceeds. The Government attributes this sum to the separate allegations contained in the Spear complaint. The Merena and Robinson qui tam Relators agree that this allocated share of the proceeds may be deducted from the total settlement proceeds before determining their respective qui tam share or shares. Thus, only the qui tam share or shares to be paid to the Merena and Robinson Relators remains to be decided in this litigation.

#### 2. *Basic Contentions of the Parties*

The Government contends that in addition to subtracting the amount allocated to the Spear complaint, there also must be subtracted $14,507,107 which was paid out of the total proceeds to various states for losses under the state Medicaid programs resulting from the alleged false claims by

SBCL that were included in the settlement.[1]

In addition, the Government contends that the qui tam Relators are entitled to no share of the proceeds recovered for certain so-called "automated chemistry" false claim allegations that were settled. The Government contends that as of the time of the filing of the qui tam actions, the "automated chemistry" allegations were under active investigation by the Government, had been publicly disclosed in the news media, and the qui tam Relators were not "original sources" of the information. The qui tam Relators dispute each of these contentions and assert that they are entitled to a minimum is percent share of the total amount obtained by the settlement including earned interest less the agreed amount allocated to the Spear complaint allegations.

The Government ascribes and allocates the sum of $241,283,471 (including interest) for the so-called "automated chemistry" allegations (see Government's Exhibit G–108), that the Government claims it recovered as a result of its LABSCAM[2] investigation. The Government contends that the qui tam Relators are entitled to no share of that allocated amount. However, because the Merena and Robinson complaints each made allegations that would, at least arguably, be encompassed within the "automated chemistry" allegations that were settled, the Government now seeks to have all of the "automated chemistry" allegations of the complaints in both 93–5974 and 95–6953 dismissed for lack of jurisdiction and/or failure to be the "first to file" the qui tam action under 31 U.S.C. § 3730(b)(5). The Government seeks presently to have these allegations dismissed even though approximately ten months prior to filing the present motion to dismiss, the Government intervened in both actions without limitation and with the consent of all parties and in conformity with the Settlement Agreement moved the court to enter an order dismissing all three qui tam actions with prejudice. The order was entered on February 24, 1997 (filed document # 33)[3]. No appeal has ever been taken by any of the Merena, Robinson or Spear qui tam Relators, nor has there been any request by any of them to reconsider or to vacate the order of dismissal[4].

The issues appear to be, therefore, (1) determination of the total fund upon which a qui tam award to the Merena and/or Robinson qui tam relators should be based and (2) determination of the percentage of that total to be awarded to the qui tam relators. Sub-issues of (1) above, are: (a) whether the qui tam relators are entitled to any proportionate share of the $14,507,-107 distributed to the individual states, (b) whether any of the allegations of the

1. 42 states and the District of Columbia executed separate settlement agreements with SBCL for their respective Medicaid losses from the alleged false claims paid to SBCL. Those agreements, together with accrued interest total $14,507.107 that they received from the total settlement proceeds.

2. LABSCAM is an acronym for a governmental investigative team that was formed and evolved an a result an investigation of National Health Laboratories, Inc. (NHL) in the Southern District of California. The NHL litigation resulted in successful civil and criminal proceedings against NHL, for alleged billing practice frauds similar to many of those alleged against SBCL. After the successful conclusion of the NHL case, the LABSCAM team was formed and proceeded to investigate alleged illegal billing practices of many of the large independent medical laboratories, including SBCL. The LABSCAM investigation, operating primarily from San Diego, California and Washington, DC, focused almost exclusively on the so-called "automated chemistry" claims.

3. All "filed document # " refer to documents filed in Civil Action 93–5974.

4. Other qui tam actions have been filed against SBCL and transferred to this court. The qui tam relators in those cases were held to be entitled to no qui tam share of the settlement proceeds involved in this litigation (filed document # 13). Their actions were dismissed, except as to a single claim that was severed because the claim was not encompassed within the terms of the Settlement Agreement and Release.

Merena and/or Robinson complaints can and should be dismissed and (c) whether the allocation which the Government assigns to the separate claims is binding on the qui tam relators in determining the total fund upon which they are entitled to receive a proportionate share. In determining the appropriate percentage share, it would appear that this depends, in the words of the statute, solely "upon the extent to which the person [qui tam relator/relators] substantially contributed to the prosecution of the action."

### 3. History of the Litigation

The three above-captioned qui tam actions were filed under a seal as required by statute by Merena (Civil Action 93–5974), Glenn Grossenbacher and Charles W. Robinson, Jr. ("Robinson") (Civil Action 95–6953), and Kevin J. Spear, The Berkeley Community Law Center, and Jack Dowden ("Spear") (Civil Action 95–6551) (collectively "the Consolidated Plaintiffs")[5]. The Consolidated Plaintiffs brought their respective lawsuits pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733. After granting multiple requests by the Government to extend the time for the Government to elect whether to intervene and to retain the seal in these qui tam actions, the Government formally intervened in these cases on September 27, 1996 and took over the litigation pursuant to 31

U.S.C. § 3730(b)(4)(A), (c)(1), and (c)(2)(A). The Government, prior to formally intervening, negotiated the settlement with SBCL on behalf of itself and the Consolidated Plaintiffs. An agreement in principle was reached by the parties in February, 1996. I issued an agreed upon Order on February 24, 1997, dismissing with prejudice all the claims settled by the Settlement Agreement and Release (filed document # 33). In that Order I retained jurisdiction over, inter alia, enforcement of the Settlement Agreement and determination of the relators qui tam shares, costs and attorney fees.

The settlement funds of $325,000,000 had earlier been placed in a court-supervised interest-bearing escrow account upon the Government's insistence, pending final execution of the Settlement Agreement. While the settlement proceeds were held in the escrow account, they earned interest and the fund grew from $325,000,000 to $333,976,266.40. On February 24, 1997, as requested by the Government, I ordered that the settlement proceeds together with the earned interest be disbursed immediately from the court-supervised escrow account at the CoreStates Bank.[6] After the funds were disbursed from the interest-bearing escrow account, no additional interest has been earned on the settlement proceeds.

On April 1, 1997, I issued an Order directing that, pursuant to 31 U.S.C.

5. Relator Merena filed suit in this court an November 12, 1993. The Robinson action was originally filed in the United States District Court for the Western District of Texas in December, 1993 (Civil Action 93–1070), and the Spear action was originally filed in the United States District Court for the Northern District of California in February, 1995 (Civil Action C95–0501–DLJ). The Robinson and Spear actions were transferred by agreement to the United States District Court for the Eastern District of Pennsylvania in the fall of 1995.

6. The order directed that: "(1) § 314.731,-103.35 of the settlement proceeds, plus interest be electronically transferred to the United States Attorney's Office for the Eastern Distract of Pennsylvania; (2) $3,703,419.14 be

electronically transferred to the United States Attorney's Office for the District of Columbia; (3) $14,460,124.01 be electronically transferred into an account at the Chase Manhattan Bank for the National Association of Medicaid Fraud Control Units, for further distribution to the states with which SBCL had settled; (4) all interest, income, and dividends either deposited or accrued in the escrow account after February 24, 1997 be electronically transferred to the United States Attorney's Office for the Eastern District of Pennsylvania to be further distributed in equal proportion to any entitled party or parties." These amounts total $332,894,646.50. However, the parties agree that the total proceeds disbursed were $333,976,266.

§ 3730(c)(2)(B), if necessary, a hearing would be held to determine if the proposed settlement was fair, adequate, and reasonable. Such a hearing would allow any interested party to contest the fairness, adequacy, and/or reasonableness of the settlement. On September 18, 1997, the Government and the Consolidated Plaintiffs filed a Stipulation and Proposed Order (filed document # 61) stipulating their "mutual interest in pursuing discussions regarding settlement of relators' shares of the settlement proceeds under the False Claims Act," and that the parties were in agreement that there was no need to conduct a hearing to determine the fairness, adequacy, and/or reasonableness of the settlement. An Order was entered to reflect this stipulation. The Consolidated Plaintiffs had expressly consented to the terms of the Settlement Agreement and Release, and the formal agreement was signed and dated on September 25, 1996. Neither the Settlement Agreement, the Release nor the Order of February 24, 1997 made any reference to a specific dollar or percentage allocation for any particular claim or claims made by any of the Consolidated Plaintiffs, or sought to quantify any separate Claim or claims beyond the total settlement figure of $325,000,000.

There is no dispute among the Consolidated Plaintiffs as to the fairness, adequacy, and reasonableness of the Settlement Agreement (filed document # 61). As previously noted, the Consolidated Plaintiffs, have agreed among themselves as to how they will divide whatever is awarded as the Relators, qui tam share of the settlement proceeds. What is currently at issue is the exact percentage to be awarded to the Consolidated Plaintiffs and the exact amount of the settlement proceeds upon which that percentage is to be based. At the present time, the only remaining interest SBCL has in this litigation is the issue of attorneys' fees that may be recoverable by Relators against SBCL.[7]

More than six months after the Government and SBCL reached a settlement in principle, and while the Consolidated Plaintiffs complaints remained under a seal, three other plaintiffs (the "Additional Plaintiffs") filed under seal separate qui tam actions pursuant to the "qui tam" provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733. Dr. William St. John LaCorte filed in the United States District Court for the Eastern District of Louisiana on April 22, 1996. Jeffrey Scott Clausen filed in the United States District Court for the Northern District of Georgia on September 3, 1996, and Donald Miller filed in the United States District Court for the Middle District of Florida on July 15, 1996. All of these cases were transferred by agreement to the Eastern District of Pennsylvania during 1996 and 1997, and docketed in this court as Civil Actions 96–7768 (LaCorte), 97–1186 (Clausen) and 97–3643 (Miller).

The Additional Plaintiffs filed Memoranda in support of their claims to the settlement proceeds, in which they contended that their claims were settled in the Settlement Agreement reached between the Government and SBCL, and that they, therefore, were entitled to a qui tam share in the $325,000,000 settlement (filed documents # 39, # 40, # 41). The original qui tam plaintiffs (the Consolidated Plaintiffs) filed oppositions to the three Additional Plaintiffs' claims to share in the settlement proceeds (filed documents # 45, # 52). Defendant SBCL took the position that the Settlement Agreement was intended to settle and release all claims asserted in the LaCorte, Clausen, and Miller actions and, in addition, that those actions were barred by the "first-to-file bar" of 31 U.S.C. § 3730(b)(5) by reason of the Consolidated Plaintiffs' prior filings. The Government contended that three claims raised by LaCorte were not included in the Settlement

---

7. The Attorneys have advised the court that SBCL and Relator Merena have agreed as to the amount of Relator Merena's attorney fees and costs in Civil Action 93–5974.

Agreement and therefore could be separately litigated.[8]

On July 23, 1997, 1 issued a Memorandum and Order dismissing all of Clausen's and Miller's claims, and all but one of LaCorte's claims—the urinalysis claim—on the grounds that these claims, in fact, were settled by the Settlement Agreement between the Government and SBCL (filed document # 57). LaCorte's urinalysis claim was severed from his other claims. Equally important, was my conclusion that Clausen, LaCorte and Miller were barred from seeking any portion of the Relators' share of the $325,000,000 settlement, based primarily on the "first to file bar" to intervention under 31 U.S.C. § 3730(b)(5).

I retained jurisdiction over LaCorte's severed urinalysis claim, over the enforcement of the Corporate integrity agreement, and over the determination of relators, share issues and the issue of attorneys, fees and costs. LaCorte, Clausen and Miller have appealed my dismissal of their claims to the United States Court of Appeals for the Third Circuit, pursuant to Federal Rule of Appellate Procedure 3(a)[9]. All three Additional Plaintiffs also filed motions to stay the execution of my Order of July 23, 1997, pursuant to Federal Rule of Appellate Procedure 8(a), pending the outcome of their appeals (filed documents # 60, # 67, # 62). The Consolidated Plaintiffs opposed granting a stay, contending that a stay of the ongoing proceedings would cause "irreparable delay and further harm to the Consolidated Plaintiffs" by possibly reducing the amount of the Relators' share of the settlement proceeds. Further, the Consolidated Plaintiffs argued that none of the Additional Plaintiffs had "posted a bond, the prerequisite

for obtaining a stay, in order to compensate the Consolidated Plaintiffs for the lost use of their expected relators' share ... during the lengthy delay occasioned by their appeals" (filed document # 65, Relators' opposition to motions for stay, p. 2). I denied all of the motions for a stay. I held further, that the Consolidated Plaintiffs were free to move at any time for a hearing for the purpose of determining the amount to be awarded to the Consolidated Plaintiffs for their qui tam share/shares (filed document # 80).

The Consolidated Plaintiffs filed a motion to deem interest and/or to segregate settlement funds for the purpose of earning interest (filed documents # 53). Relator LaCorte filed a similar motion (filed document # 66). The Consolidated Plaintiffs and Relator LaCorte argued that at least the statutory minimum of the total settlement proceeds should be set aside in escrow for the purpose of earning interest during the pendency of the litigation. The motion requested the court to segregate, or set aside, twenty-five percent (25%) of the $333,976,266.40 of settlement funds (the maximum that could be awarded under the statute).

The Consolidated Plaintiffs argued in this motion that they were prejudiced by strategic moves by the Government that resulted, and continue to result, in lengthy delays in the disbursement of their relators' shares. As a result of these delays, the Consolidated Plaintiffs claimed that they had lost and were losing use of the money due them and had lost interest they would have earned had the money been deposited into an interest-bearing account at the time of the disbursement from the escrow account. The Consolidated Plaintiffs contended that the Government's stra-

---

8. The Government and the Consolidated Plaintiffs contended that LaCorte's Claim 1 (Complete Blood Count Claim), Claim 3 (Unauthorized Testing an Part of a Screening Program), and Claim 4 (Unauthorized Testing as Part of an Annual Audit Program) were not settled, but that all of Claim 2 (Substitution of More Extensive Chemistry Profiles) and Claim

5 (Misleading Requisition Forms) were settled.

9. Relator Jeffrey Clausen also filed a Motion to Extend Time for Filing Notice of Appeal (filed document 0102), but that motion was denied (filed document # 212).

tegic move of repeatedly asking for extensions of time to intervene and to extend the seal period in the qui tam actions unduly prejudiced them in that during these delays, the Consolidated Plaintiffs were forced (and continue to be forced) to engage in months of litigation with the Additional Plaintiffs "who filed their qui tam actions during the latter stages of the protracted seal period." (filed document # 53, Motion of Consolidated Plaintiffs to Deem Interest or to Segregate Settlement Funds for the Purpose of Earning Interest, p. 6) The Consolidated Plaintiffs contended that the Government could have and should have promptly raised the first-to-file bar against all potential later-filed qui tam actions including the actions of the three Additional Plaintiffs by intervening in the Consolidated Plaintiffs' actions before the first Additional Plaintiff, LaCorte, filed his suit on April 22, 1996 (after the Government and SBCL had agreed in principle to the settlement). Furthermore, they claimed they were prejudiced by the delays the Additional Plaintiffs caused by way of filing their claims in the first place, and by their subsequent appeals of the dismissals of the Additional Plaintiffs claims. The Consolidated Plaintiffs contended that they have fully complied with the Government's requests throughout the litigation of these cases, including extensions of the period of the sealed filings, and resolving any differences that may have existed among themselves, only to be stonewalled by the Government and the Additional Plaintiffs.[10]

The 25 percent of the total settlement proceeds which the Consolidated Plaintiffs moved the court to segregate represents the maximum percentage, or share, of the proceeds to which they could be entitled under the False Claims Act, 31 U.S.C. § 3730(d). Although, they conceded that they probably will not be awarded the maximum share, the Consolidated Plaintiffs asserted that setting aside the maximum amount that could be awarded, fully protects the Government. If the Relators' share is ultimately determined to be less than 25 percent, the Government would collect the balance, including accrued interest on the balance (filed document # 53, Motion of Consolidated Plaintiffs to Deem Interest or to Segregate Settlement Funds for the Purpose of Earning Interest, p. 14, n. 2).

In support of its request that the Government be ordered to deposit the settlement proceeds in an interest-bearing account, the Consolidated Plaintiffs alleged that because of the nature of the relationship between qui tam plaintiffs and the Government in qui tam suits, the Government acts as a fiduciary over any settlement proceeds recovered. The settlement proceeds, they argued, can be likened to a trust fund, and by statute, all money held in trust by the Government must be deposited in an interest-bearing account, pursuant to 31 U.S.C. § 1321 and 31 U.S.C. § 9702.[11] In an order dated October 28, 1997, I denied these motions on the ground that the Government is not a fiduciary of the settlement proceeds (filed document # 80). The Government neither expressly nor impliedly agreed to act as a fiduciary of these funds. Characterizing the settle-

10. · The Government did not elect to intervene until after it had agreed with SBCL on specific settlement terms to resolve all of the claims in the Consolidated Plaintiffs' cases and long After the February 6, 1996 agreement in principle had been negotiated.

11. Subsection W of 31 U.S.C. § 1321 provides in part that: Amounts (except amounts received by the Comptroller of the Currency and the Federal Deposit Insurance Corporation) that are analogous to the funds named in subsection (a) of this section and are re-

ceived by the United States Government as trustee shall be deposited in an appropriate trust fund account in the Treasury.

31 U.S.C. § 9702, Investment of Trust Funds, specifies that: Except as required by a treaty of the United States, amounts held in trust by the United States (including annual interest earned on the amounts)—
(1) shall be invested in Government obligations; and
(2) shall earn interest at an annual rate of at least five percent.

ment funds as a trust fund is inappropriate. I ruled, therefore, that there is no requirement that the Government deposit the proceeds in an interest-bearing account.

Relator LaCorte moved to sever his urinalysis claim from the remainder of his claim. This motion was granted, and LaCorte, in turn, filed a motion to retransfer the severed urinalysis claim back to the Eastern District of Louisiana (filed document # 81). Citing the pending appeals of the dismissed claims and the possible effect of the outcome of these appeals on the overall litigation, I denied both LaCorte's motion for retransfer (filed document # 98) and his motion for reconsideration of my earlier denial (filed document # 111).

On December 2, 1997, 1 met with the parties in chambers, and the parties agreed informally to a proposed scheduling order. The parties have complied with this informal agreement. Both the relators and the Government have filed *in camera* proposed procedural orders, but no formal procedural order was issued.

On January 23, 1998, Relator Merena filed a motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), requesting that judgment be entered for him in the amount of $10,385,412, which is 16 percent (the percentage suggested by the Government as being appropriate) of those settlement proceeds that the Government has conceded should be utilized for purposes of determining the qui tam share based on what the Government contended were the six "Merena only" claims. Merena further argued that entry of partial summary judgment would streamline litigation of the remaining issues (filed document # 110)[12]. Because of the Government's alleged concession on this issue, Merena argued that there was no genuine issue as to any material fact, and that he, therefore, was entitled to a partial judgment as a matter of law.

The Government opposed this motion on the grounds that Merena had placed at issue whether the Government's allocation of the settlement proceeds among the various claims was proper. The Government contended that although it recommended the allocation and award of 16 percent of the settlement proceeds as to the so-called non-LABSCAM or six Merena-specific allegations, Merena's claim for a larger share effectively put the determination of his share at issue. Because of this, the Government argued that there was a genuine dispute as to material facts and therefore the motion for partial summary judgment should be denied.[13]

I issued a Memorandum and Order on February 23, 1998 entering judgment in favor of Relator Merena and against the Government in the amount of $9,736,324, which represents the minimum 15 percent of the $64,908,828 the Government allocated to Merena's six non-LABSCAM claims (filed document # 124)[14]. This judgment was entered without prejudice to the right of any of the Consolidated Plaintiffs, including Merena, to seek and to claim, in this litigation, additional compensation as a qui tam share in the total proceeds of the settlement between the Government and SBCL.

12. The six claims Merena claims only he raised are as follows: 1) urinalysis tests; 2) prostate specific antigen ("PSA") tests; 3) pap smear tests; 4) tests performed for end stage renal disease patients ("ESRD"); 5) tests not performed ("TNP"); and 6) kickbacks.

13. The Government states, "Mr. Merena would have this Court reserve the question of whether 'the Government's allocation of the settlement proceeds among issues and to the various states was improper.' " (United States' opposition to motion of Robert J. Merena for Partial Summary Judgment, p. 2).

14. The $64,906,828 figure includes a pro-rated share of the accrued interest. The Government appears to agree that accrued interest should be treated the same as principal in calculating the qui tam share or shares of the proceeds.

### 4. Motions for Determination

Currently there are four motions outstanding: 1) the Consolidated Plaintiffs' motion for the determination of relators' share (filed document # 86); 2) the Government's motion with respect to the distribution of settlement proceeds (filed document # 105); 3) the Government's motion to dismiss the Relators' "automated Chemistry" allegations and to dismiss any of the relators' claims to any share of the state recoveries (filed document # 101); and 4) a motion by SBCL regarding attorneys, fees (filed document # 117). The Government filed *in camera* proposed findings of fact and a reply to the Consolidated Plaintiffs' proposed allocation of the proceeds. The Government also filed a status report regarding discovery (filed document # 118). Both the Government and Relators Merena and Robinson, filed witness lists (filed documents # 115 and # 116). A seven-day evidentiary hearing was held beginning on March 16, 1998, to resolve all of the outstanding motions, including the issue of relators' share.[15] Both the Government and the Relators have filed post-trial motions to support and supplement arguments made in open court during the seven-day hearing.

### a. Consolidated Plaintiffs' Motion to Determine Relators' Share

The Relators contend, as they have throughout the litigation, that they are entitled to an award between 15 and 25 percent of the entire proceeds of the settlement and accrued interest. They contend a percentage in excess of the statutory minimum of 15 percent is justified because of their substantial contributions to the investigation as well as the significant risks they have taken in their efforts to supply information to the Government during its investigation. Based on 15 per-

cent of an allocation of $13,297,829 of the settlement fund to the spear Relators those Relators have agreed to settle their claims to a qui tam share. The Merena–Robinson Relators do not contest this award and agree that the $13,297,829 allocation should be deducted from the proceeds in determining their qui tam shares. Specifically, the other Consolidated Plaintiffs, Merena and Robinson, are requesting an award of 18 percent of the total recovery, including interest earned on the escrow account, after deducting the Spear Relator allocation.[16]

### b. Government's Motion Regarding the Distribution of Settlement Proceeds

In the Government's motion regarding the distribution of settlement proceeds (filed document # 105), the Government argues that the Relators may not presently raise objections to the Government's allocation of the settlement funds to Relators, specific claims for purposes of determining Relators' share. The Government takes this position because, it argues, the Relators agreed that the terms of the settlement with SBCL were fair, adequate and reasonable, and they knew exactly the allocations utilized by the Government for purposes of the settlement with SBCL. The Government argues that the Relators effectively waived their right to challenge the Government's allocation because they did not challenge the fairness of the Settlement Agreement and, therefore, the Government's allocation of the proceeds between and among the various claims is now binding against the Relators.

The Relators, on the other hand, contend that they were never put on notice that by agreeing to the Settlement Agreement, they were also agreeing to the Gov-

---

**15.** The findings at this hearing are discussed in more detail under the heading, "Relators' Contribution to the Prosecution of the Action," of this Opinion.

**16.** Merena and Robinson agree, however, as above noted, that from this total there be

deducted the amount allocated to settling the Spear parties' claims. Consequently, the Relators are requesting an award of 18% × ($333,976.266.40 − $13.297.829) which totals $57,722,118.73.

ernment's allocations for purposes of determining the Relators' qui tam share. Their contention is that they agreed to the overall settlement amount and terms, but that the determination of the Relators, share was an issue totally separate and outside the scope of the Settlement Agreement. They contend that they understood that the determination of Relators' share was reserved until after the Government settled the qui tam actions with SBCL. The Government's conduct after the settlement and until just recently supports this understanding, they claim. For example, the Consolidated Plaintiffs cite several instances in which the Government represented to them and to the court that it had not yet determined the allocation of Relators, shares.

The Government contends that for purposes of negotiating the settlement with SBCL, the so-called automated chemistry allegations were valued at $234,798,505. After adding interest earned on the escrow account, that sum amounted to $241,283,-471, or approximately 72 percent of the total proceeds including earned interest. (See Government's Motion to Dismiss the Automated Chemistry Allegations, etc., Exhibit #2, filed document #101). In addition, the Government allocated $14,-507,107 with interest included for payment to various states as their "Medicaid share" of the settlement. The Government contends that these two sums, i.e., the $241,-283,471 (automated chemistry) and the $14,507,107 (states Medicaid proceeds) plus the $13,297,829 agreed allocation to the Spear Relators must be deducted from the total proceeds for purposes of determining the Relators' share. Therefore, based on total proceeds of $333,976,266.40,

the Government contends that Relator Merena is entitled to a qui tam share of $10,385,412, which represents 16 percent of the net balance of $64,908,828 [17] allocated by the Government's calculations to the "Merena non-LABSCAM" allegations.[18] The Government alternatively contends that the Consolidated Plaintiffs, at most, are entitled to no more than 10 percent of the recovery for the Relator's automated chemistry claims.

### c. Motion to Dismiss Relators An to the "Automated Chemistry" Claims

The Government has moved to dismiss all of the so-called "automated Chemistry" allegations of the Relators, complaints pursuant to Federal Rule of Civil Procedure, 12(b)(1) as to whichever Relator the court deems to have been the "first to file" the automated chemistry allegations settled between the Government and SBCL under 31 U.S.C. § 3730(b)(5) [19].

First, the Government seeks to bar Relators from any share in the recovery for the automated chemistry claims, pursuant to the jurisdictional bar in 31 U.S.C. § 3730(e)(4), because of allegedly widespread public disclosures of the automated chemistry allegations against SBCL and the Government's ongoing investigation of SBCL prior to any Relator filing a qui tam action.

The Government argues that the Relators' complaints are jurisdictionally barred as to any "automated chemistry" allegations because the investigation into these claims commenced by the Government prior to, and independent of, any contact with

---

17. Using the above figures, the net balance would be $64,887,859, a Discrepancy of $20,-969.

18. The Settlement Agreement did not make any mention of any specific state allocations, but it was understood by the parties that a sum of the proceeds would be paid to the states, as in reflected in my Order of February 24, 1997 which Orders that $14,460.124.01 be disbursed for the settlement of the states'

claims. The amount actually disbursed was $14,507,107.

19. There appears to be no dispute that both Relators Merena and Robinson, in their qui tam complaints, made allegations of fraud involving automated chemistry tests, although Relator Merena's may have been rather general.

the Relators.[20] Specifically, the Government argues that because of the high-profile media coverage of the investigation into the automated chemistry claims prior to the Relators, filing their qui tam actions, the Relators' claims are jurisdictionally barred pursuant to the False Claims Act's public disclosure bar. 31 U.S.C. § 3730(e)(4)(A). The Government's argument is that the Government was already aware of SBCL's illegal conduct and was in the process of investigating this conduct as part of its ongoing LABSCAM Task Force investigation before any of the Relators came forth with any information. Moreover, the Government points out that, prior to the filing of any of these qui tam actions, there were articles in the *New York Times* and various industry publications, as well as an exposé on a CBS television broadcast of the show *60 Minutes* on September 19, 1993, entitled "Blood Money," concerning the filing of false claims by three medical laboratories including SBCL.[21]

Second, the Government seeks to bar Relator Robinson and others because of the first-to-file bar rule in 31 U.S.C. § 3730(b)(5). The Government argues that upon the court's determination of which Relator was the first to file an automated chemistry claim, the later filing Relators are barred from making any automated Chemistry claims because no person other than the Government may intervene in a qui tam action or "bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

In the alternative, the Government contends that even if the court had jurisdiction over the qui tam plaintiffs' automated chemistry claims, the Relators would still only be entitled to a relator's share in the range of zero to ten percent of the recovery allocated to the automated chemistry claims. It is the Government's contention that no Relator qualifies as an "original source" as to the automated chemistry allegations, but that even if a Relator was an original source, the qui tam share should be limited to a low percentage in the zero to ten percent range category for the amount of the proceeds allocated to the automated chemistry claims.

In response to the Government's motion, the Merena–Robinson Relators contend that 31 U.S.C. § 3730(e)(4) "does not divest the court's jurisdiction over 'parties' ... but instead over the entire action." (filed document # 113, Reply of Relators to Government's Motion to Dismiss Automated Chemistry Allegation, p. 16). Therefore, they argue, when the Government intervened in the actions, it "assured the court's jurisdiction over the Relators' 'actions.'" (filed document # 113, Reply of Relators to Government's Motion to Dismiss Automated Chemistry Allegation, p. 16). By intervening, the Relators contend, the Government "establishes subject matter jurisdiction, whether or not, absent intervention, the Court would have had jurisdiction over the Relators." (filed document # 113, Reply of Relators to Government's Motion to Dismiss Automated Chemistry Allegation, p. 14).

The Relators contend that they are not jurisdictionally barred by the statute because none of the so-called public disclosures the Government references actually disclose the "allegations or transactions" of SBCL's fraud schemes as alleged in their respective qui tam actions and their actions were not based upon any public disclosures. The Relators allege that they were the original voluntary sources of the

---

20. A non-public governmental investigation would not bar the filing of a qui tam action. See discussion, *infra*.

21. In the *60 Minutes* story, one of the shows Associate Producers went to a SmithKline laboratory with an order for a SMAC (automated blood chemistry panel), CBC, and thy-roid test. The bill generated by SBCL was then examined on camera, and the bill was found to include an un-ordered, but billed, magnesium test. Transcript of "Blood Money," *60 Minutes*, CBS News, September 19, 1993, p. 20.

information upon which their respective qui tam actions were based, including the so-called "automated chemistry" allegations. They contend that they had personal, direct and independent knowledge upon which they based all of their allegations. They contend that none of their claims or allegations were based upon or derived from already publicly disclosed information, but were all made upon their individual firsthand personal knowledge. The Relators assert, further, that because there was no public disclosure of their particularized claims or of the allegations or transactions upon which their actions were based including the automated chemistry claims, there is no issue as to whether they were an original source.

The Government requests, pursuant to Federal Rule of Civil Procedure 12(b)(6) that the court dismiss the Relators' claims to a share of the state portion of Medicaid funds recovered by forty-three states from SBCL as a part of the overall settlement.[22] The $14,507,107 that was paid to the states was deducted from the total $325,000,000 plus accrued interest that the Government received. The Government argues that these state funds were not recovered under the federal False Claims Act, 31 U.S.C. §§ 3729–3733, and, therefore, the Relators are not entitled to a share of these state settlement proceeds. The Government claims that the federal statute does not entitle the Relators to any share of the state proceeds. Because these proceeds were paid directly by SBCL to the states and not to the Government, the Government contends it never had or received this money, and it is now the Relators' burden to deal directly with the states if they believe they are entitled to some portion of the "Medicaid" recoveries paid to the states.

It is the Relators' contention that they are entitled to a percentage share in the total "proceeds of the action or settlement of the claim," 31 U.S.C. § 3730(d)(1), including that portion "unilaterally diverted to forty-three states." (filed document # 113, Reply of Relators to Government's Motion to Dismiss Automated Chemistry Allegation, p. 140). Therefore, Relators contend that the amounts paid to the states should not be deducted from the total fund of money from which their Relators' share should be calculated.

Despite the argument that the Relators should share less than the 15 percent statutory minimum on the "automated chemistry" claims, it appears that the Government concedes that Relator Merena is entitled to a qui tam share in the 15 to 25 percent range of all proceeds recovered based on Merena's "non-automated allegations" or his "new allegations." The total recovery for these new allegations has been valued by the Government at $64,908,828, including pro-rated earned interest. The Government suggests that an appropriate percentage for these non-automated chemistry claims should be 16 percent. Therefore, the total maximum recovery the Government contends Relators Merena and Robinson are entitled to receive would be $10,385,412.48.

The Relators differ with the Government in three major respects. First, they place a higher value on "the extent to which they substantially contributed to the prosecution of the actions." 31 U.S.C. § 3730(d)(1). They claim that their Relators' share should be at least IS percent rather than 16 percent as suggested by the Government. Second, they contend that they are entitled to at least 18 percent of the total settlement fund, including the automated chemistry claims and the money paid to the states as part of the Settlement Agreement, less the $13,297,829 allocated for the Spear Relators, regardless of how the funds were allocated by the Government for the purposes of negotiating a settlement with SBCL or distributed

---

22. The Government indicates that the state funds total $14,507,107 which includes the *pro rated* share of the earned interest.

among the various federal and state agencies. Third, they contend that they are not, and cannot now, be jurisdictionally barred by the public disclosure bar and that they should not be limited to recovery on only the non-automated chemistry claims.

#### d. *Motion of SBCL in regard to Attorney Fees and Costs*

SBCL has advised that it has agreed to the amount of attorney fees and costs it will pay to Relator Merena, in Civil Action 95–6953. SBCL contends that it should not be required to pay any counsel fees or costs to the Robinson Relators in Civil Action 95–6953 or to the Spear Relators in Civil Action 95–6551, largely because of the "first to file law." However, all three civil actions, 93–5974, 95–6953 and 95–6551 were settled and dismissed with prejudice by agreement of all parties. The settlement expressly settled all claims asserted in the three qui tam actions and certain other additional claims as set forth in the Settlement Agreement and Release for $325,000,000. There was no allocation of the proceeds between or among the qui tam actions, or among the various claims. There was no motion filed by any party prior to the dismissal of the actions challenging the court's jurisdiction over any or all of the claims, nor any motion to dismiss any claim or claims. For this reason, it would appear that reasonable attorney fees and reasonable expenses necessarily incurred and costs should be awarded to the qui tam Relator in each of the three actions.

### B. *DISCUSSION*

#### 1. *Irrelevant Considerations.*

Before discussing the discrete legal and factual issues, several arguments advanced by one or more of the parties to this litigation may be briefly set aside.

■ Relator Merena, and perhaps other Relators, argue extensively as to the risk and hazard to their respective occupational reputations and future employment prospects, as well as to the disruption of their family life by reason of being "whistle-blowers." Nothing in the statute remotely suggests that these are appropriate Considerations in determining the amount or proportionate share to be awarded qui tam relators. 31 U.S.C. § 3730(d)(1) sets forth as the only guideline for the 15 to 25 percent range "the extent to which the person substantially contributed to the prosecution of the action or settlement of the claim," and, as to the "not more than 10 percent" range (if applicable), "the significance of the information and the role of the person bringing the action in advancing the case to litigation." The two tests, one for the 15 to 25 percent range and the other for the "not more than 10 percent" range appear to be essentially the same; namely, the extent to which the qui tam relator's information and assistance helped the successful prosecution and, in this case, settlement of the case. Apparently, Congress concluded that the proportionate share of the proceeds established by the statute was an adequate incentive and compensation to a qui tam relator for the economic and personal risks in filing a qui tam action, and that the primary guideline for the percentage to be awarded should be the aid and assistance the information provides toward the ultimate conclusion of the case.

The extensive arguments presented by both the Relators and the Government as to the Government's treatment of qui tam Relators in other actions in which a qui tam percentage share was awarded and/or paid by the Government, whether voluntarily by agreement or after litigation, would appear to have no relevance to the present issues except possibly as some precedence as to what might be an appropriate percentage in this case.

■ The Government, in various of its briefs and filings seems to argue that because of the ongoing LABSCAM investigation, the investigation of SBCL would have ultimately proved just as successful as the

investigation of NHL, at least as to the automated chemistry claims, without the aid and assistance of the Relators, and therefore, that the Relators are somehow barred from any recovery as to those claims. I find nothing in the statute that states or suggests that merely because the Government is carrying out an investigation, a qui tam action is barred. The necessary element under the statute is not an investigation but rather public disclosure. Government investigations are ordinarily not publicly disclosed until they are completed. Merely because a qui tam complaint may make allegations that correspond with or parallel allegations that a Government agency may be investigating, the qui tam action is not barred, nor is the qui tam Relator precluded from an appropriate statutory share of any resulting recovery.

■ The Government has also made some suggestions that because there was a very large recovery against SBCL [23], the percentage awarded should be on the lower rather than on the higher end of the appropriate statutory range. There is nothing in the statute to suggest that the amount of the total recovery is, or should be, an appropriate consideration in determining the percentage range or in calculating the total qui tam award. Had Congress intended the amount of the award to be a relevant factor in establishing the percentage of the recovery, it could have simply enumerated this as a relevant factor to be considered, or Congress could have directed a sliding scale of percentages depending on the dollar amount of the recovery. Obviously, Congress had to be well aware that a qui tam Relator could indeed recover a very large sum of money as a qui tam award if the civil recovery that Government obtained from the defendant was also very large. Therefore, I do not consider the amount of the total settlement to be a relevant factor in determin-

ing what percentage of the recovery should be paid to a qui tam relator.

Finally, both the Government and the Relators argued extensively about matters occurring after the date of the settlement, which for the purpose of deciding the qui tam Relators, share would be, at the latest, the date of the dismissal of the actions on February 24, 1997. The extent, if any, to which the Relators may have assisted or cooperated with the Government in any ongoing or further investigation seems to me to be wholly outside the scope of inquiry in determining the percentage and amount of the award to go to the qui tam Relators for their assistance in bringing about the settlement and the termination of these actions.

### 2. *Justiciability of the percentage range*

The statute makes no specific reference as to the procedure to be utilized in determining what percentage, within the statutory 15 to 25 percent range, should be awarded a qui tam Relator, nor does the statute expressly provide that the issue of the appropriate percentage is a matter to be decided by the courts in the absence of an agreement between the Government and the Relators.

In several sections the statute makes explicit that certain issues are subject to a court hearing, and, therefore by inference, subject to a court decision. As examples of such clearly justiciable issues are: (1) dismissal or settlement of qui tam actions by the Government over the objection by relators (31 U.S.C. § 3730(c)(2)(A) (dismissal) and (B) (settlement); (2) limiting the litigation participation of a qui tam relator when the Government proceeds with the action, 31 U.S.C. § 3730(c)(2)(C) and (D); (3) permitting the Government to intervene at a later date upon a showing of "good cause," (31 U.S.C. § 3730(c)(3); (4) staying discovery on the application of the

---

**23.** The Government quite properly emphasized in announcing the settlement with SBCL that the settlement was the largest re-

covery ever obtained under the False Claims Act for health care fraud.

Government (31 U.S.C. § 3730(c)(4); (5) an award in the zero to ten percent range—"the Court may award such sum as it considers appropriate"—(31 U.S.C. § 3730(d)(1)).

Curiously, the statute says nothing as to whether a court in a judicial proceeding may determine what percentage between the 15 and 25 percent range, where applicable, should be awarded. Having expressly provided for court decision as to some issues, but no mention as to the 15 to 25 percent range, it could be argued that the actual percentage is a matter committed solely to executive (prosecution) branch discretion, reviewable, possibly, only for an abuse of governmental discretion.

None of the parties to this litigation have contended that the court may not decide what percentage should be awarded. Case law, without discussing or mentioning the justiciable issue suggests that when the parties cannot agree as to the proper percentage, the matter is appropriate for court judicial decision,[24] to determine "the extent to which the person [qui tam Relator] substantially contributed to the prosecution of the action" (15 to 25 percent range) and "the significance of the information and the role of the person bringing the action in advancing the case to litigation." 31 U.S.C. § 3730(d)(1).

I will proceed to first decide the justiciable issues, namely (1) the motion to dismiss the "automated chemistry" claims in Civil Actions 93–5974 and 95–6953; (2) the amount of the proceeds upon which the qui tam percentage award will be based; i.e., whether the state Medicaid recoveries of $14,507,107 should first be deducted from the fund upon which the percentage is calculated; (3) whether the allocations as to separate claims, including the Medicaid, the "automated chemistry" and the other "non–Merena only" claims utilized by the

Government in negotiating the settlement with SBCL are binding on the qui tam Relators in determining their qui tam share; (4) whether the 15 to 25 percent range or the zero to ten percent range should be applied to the whole or to separate portions of the claims. Finally, assuming that establishing the actual percentage or percentages are justiciable, the percentage or percentages that should be applied will be decided and judgment will be entered for the amount of the qui tam award.

### 3. Dismissal of the "Automated Chemistry" Claims

The complaints in both Civil Actions 93–5974 and 95–6953 seem clearly to allege all of the so-called "automated chemistry" claims. The Government apparently concedes this and, for that reason, in order to prevent qui tam Relators from sharing any percentage of any recovery attributable properly to those claims, seeks to have those portions of the qui tam complaints dismissed.

■ I find no case that remotely suggests that a district court could now dismiss any of the particular claims made in any of the three qui tam complaints. To begin, all three qui tam complaints were dismissed, with prejudice, including all claims set forth in the complaints, upon the motion of the Government and with the joinder of qui tam Relators and SBCL. I retained jurisdiction over only enforcing the settlement agreement and determining the qui tam shares to be awarded out of the settlement and attorneys fees and Costs and expenses to be assessed against SBCL in favor of the qui tam Relators. Although not directly applicable, the case of *Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) makes it apparent, at least to me, that when a

---

**24.** *United States v. General Electric,* 808 F.Supp. 580 (S.D.Ohio 1992); *United States v. Stern,* 818 F.Supp. 1521 (M.D.Fla.1993); *United States ex rel. Coughlin v. IBM,* 992 F.Supp. 137 (N.D.N.Y.1998); *United States ex rel. Burr v. Blue Cross and Blue Shield of Florida,* 882 F.Supp. 166 (M.D.Fla.1995).

case is finally dismissed with prejudice, the court loses all jurisdiction except to the extent that jurisdiction is expressly retained in the order of dismissal.

■ The Government seeks to have Relator Merena's automated chemistry allegations dismissed pursuant to Federal Rule of Civil Procedure 9(b) for failure to plead fraud as to those allegations with sufficient specificity. How or why this should be done at this time, long after the case was settled and dismissed with prejudice in its entirety is not explained. Even if a timely motion had been made, and granted, undoubtedly the plaintiff would have been afforded an opportunity to replead and specify in detail. I consider this argument by the Government to be frivolous. This assertion by the Government is perhaps one of the reasons why the qui tam Relators feel forced to argue that the Government is trying in every conceivable way possible to defeat their respective claims for the qui tam share that they believe they are entitled to receive under the law. To the extent that the Government is asking this court to dismiss Relator Merena's automated chemistry Claims for failure to specifically allege fraud, the motion will be denied.

The Government's primary contention as to both Merena and Robinson's automated chemistry Claims is that these claims should be dismissed from both of the qui tam complaints because of lack of subject matter jurisdiction, pursuant to the bar of 31 U.S.C. § 3730(e)(4)(A). The qui tam actions, including all claims asserted therein have already been dismissed with prejudice. They do not have to be re-dismissed. Perhaps of even more importance, the Government does not contend that the court lacked jurisdiction over the actions, but merely certain of the claims alleged in each of the actions.

The qui tam Relators contend that their automated chemistry claims were not "based upon" any public disclosures or obtained or copied from news reports or media, but were based upon their personal knowledge and information and that they were, in any event, "original sources" within the meaning of the statute 31 U.S.C. § 3730(e)(4)(B). They also contend that irrespective of whether their respective actions, as to some of the claims might have been subject to dismissal under 31 U.S.C. § 3730(e)(4)(A) and (B), no motion to do so was ever made, and upon the Government formally intervening in the action, the question of the court having subject matter jurisdiction was mooted. I agree.

On the motion to dismiss the automated chemistry claims, I conclude that the motion will be denied. In doing this, I do not decide whether those claims could have been barred because of preexisting public disclosures and whether either of the Relators were "original sources" if the motions had been made before the dismissals.

■ Even if the "automated chemistry" claims could have been, or may even now be subject to dismissal, this would not necessarily preclude the qui tam Relators from sharing within the 15 to 25 percent range on the "proceeds of the action or settlement of the claim." Where a qui tam action is filed, and the Government intervenes and expands the allegations of the complaint, or settles the action, including broader Claims than alleged in the qui tam action, this should not preclude the qui tam relator from receiving the minimum statutory qui tam share of 15 percent of the entire settlement, as well as a percentage above the 15 percent minimum up to the maximum of 25 percent "depending upon the extent to which the person [qui tam Relator] substantially contributed to the prosecution of the action."

### 4. Allocation of Values to Specific Claims

The denial of the Government's motion to dismiss all of the automated chemistry claims contained in the qui tam Relators' complaints does not necessarily mean that the Relators are entitled to a share in the 15 to 25 percent range, or indeed even in

the "not more than 10 percent" range. The Government contends that the court must consider the actions of the Relators on a claim by claim basis irrespective of whether the automated chemistry allegations are dismissed. As to those claims in which there was prior public disclosure and the Relators were not "original sources", the Government argues that the Relators are entitled to no qui tam share of the proceeds.

 The qui tam statute involved makes no mention of treating a qui tam complaint as having distinct and divisible claims for the purpose of determining the qui tam Relator's share of the proceeds. The statute provides that where the Government intervenes and proceeds with the *action,* as it did in these cases, the qui tam Relator shall "receive at least 15 percent but not more than 25 percent of the proceeds of *the action* or settlement of the claim." (Underlining added). The statute speaks of the action and claim as a single unit or whole entity. It would seem almost inevitable to me that at least in most qui tam actions there would be allegations of multiple false claims alleged in a complaint. The qui tam actions involved here were settled as to all claims, whether or not validly pled or substantively valid, for a single overall sum of money. In determining the portion to be paid to qui tam Relators, I do not think the statute ever contemplated that a court should, after the fact of settlement, consider each separate claim to determine whether the claim was subject to dismissal because of pre-filing public disclosures and/or whether the Relators were an "original source." The Government never sought to have any of the Relators' qui tam allegations dismissed prior to entry of the order settling and dismissing each of the actions with prejudice. Neither did it ever seek leave to file an amended complaint, as it undoubtedly had the right to do.

Far more important, at least to me, is that in all three of the qui tam actions, the Government intervened, and settled with SBCL (with the consent of the Relators) for an overall settlement sum of $325,000,-000. The signed Settlement Agreement and the executed Releases designated no monetary allocation or division among various claims, other than mention that the settlement included all enumerated claims by various Governmental agencies, and by the separate state claims for their respective Medicaid losses. Neither did the Settlement Agreement, the Releases or anything else filed of record seek to allocate or quantify a dollar amount between or among the three qui tam actions or the separate claims of each action.

The evidence is specific and clear that although the Government, in determining the reasonableness and adequacy of the overall settlement, evaluated the monetary value of certain distinct claims, the settlement between the Government and SBCL was an arbitrary "bottom line" figure of $325,000,000 for all of the claims that were set forth in the Settlement Agreement through the date of September 16, 1996. The settlement expressly included all of the claims set forth in the three qui tam actions and all claims for the states' Medicaid losses. SBCL certainly did not settle the qui tam actions or any specific claim or claims asserted therein for any specific sum other than the overall figure of $325,-000,000.

 Even if the court should consider the qui tam shares on a claim by claim basis, because the only quantified amount is the overall settlement of $325,000,000, it seems to me that, at the least, the Government would have the burden of proof to establish such allocation of the settlement proceeds it seeks to have the court make. The Government apparently contends that it has fully established this and met any burden of proof that it may have, because prior to the settlement being approved, the Government submitted to the Relators its proposed allocations that it would present to SBCL for the purpose of concluding settlement negotiations. The evidence is clear however, that no representative of

438

the Government ever informed any of the Relators that the Government would contend that these calculations would be binding on Relators in determining their respective qui tam shares. Neither did the Government ever inform any of the Relators that if the matter of the qui tam shares would ever be litigated, the Government would contend that the Relators had waived any right to contest such allocations because they had agreed to the overall settlement with SBCL with knowledge of the allocations assigned by the Government for purposes of negotiating the settlement.

■ To the extent that a finding on waiver is necessary or appropriate, I find as a fact that the Government's position that the Relators must accept and are bound by the Government's allocation was never expressed to the Relators prior to their agreeing to the settlement. Even in Court filings and representations to the court, long after the settlement was approved, and while the issues of the Additional Plaintiffs' right to share in the proceeds as qui tam relators was being litigated, the Government repeatedly stated that it had not yet calculated or determined what amount it would offer to the qui tam Relators, either individually or in total.

I find the Government's position that the Relators, by not objecting to the overall settlement somehow waived their right to challenge the Government's assigned allocations of proceeds to particular claims to be unacceptable. So far as the evidence discloses the allocations were unilaterally set by the Government. They were never expressly agreed to by any party, including SBCL. The Government now contends that not only the Relators, but also the court, must accept at face value those allocations. The Government used the allocations of proceeds among claims solely for purposes of negotiating a settlement and to calculate distribution of the proceeds among the various affected governmental agencies.

There is absolutely no evidence on the record before me, beyond the unacceptable waiver argument, to establish any allocation among various claims. The Relators repeatedly sought explanation from the Government, both informally and in discovery, as to the Government's allocation calculations. The Government's only response is, and always has been, that the calculations were based on rational estimates of losses and complex negotiations among the various governmental agencies and that the parties and the court are bound to accept the Government's calculations. It seems to me to be almost a "trust us, we are not wrong, we are correct" attitude. The Government tries, at a minimum, to require Relators to prove the allocations are in error without providing Relators with any discovery on the issue, although such discovery was requested. This I cannot accept.

I conclude on this issue, that the Relators are not bound by the allocations assigned by the Government as to the automated chemistry, the "new Merena-only" and the Spear qui tam allegations. It is the Government that attempts to reduce the individual and total qui tam award shares by assigning particular values to various claims. Even if dividing the proceeds among separate claims would be appropriate, there is no evidence upon which a factfinder could rationally make such a determination on the record before me. All parties were provided with a full opportunity to develop the record on all issues.

In determining the qui tam share or shares to be paid to the Relators, the claims may not be allocated for dollar amounts between or among the automated chemistry, the "new Merena only" and other claims. First, neither the Settlement Agreement, the Release nor any statement or document on record at the time of the approval of the settlement ever mentioned any separate sum of money other than the $325,000,000. Second, the statute makes no suggestion that a qui tam award should be based on a claim by claim basis to

determine which claims are valid or what the individual monetary worth of separate claims were to the overall settlement. The percentage of the award above the minimum is to be based upon the extent to which the qui tam Relator substantially contributed to the prosecution of the *action*. Third, Relators did not waive their right to contest any governmental allocations of proceeds to particular claims. Finally, there is no basis in the evidence upon which a monetary allocation among claims could rationally be made.

### 5. *Medicaid Fraud Payments Made to 42 States and the District of Columbia*

The February 24, 1997 order of distribution from the escrow account directed that "$14,460,124.01 be distributed into the National Association of Medicaid Fraud Control Units, for further distribution to the states with which SBCL had settled." The total amount of net proceeds recovered by the Government was $319,469,159 ($333,976,266 less $14,507,107).[25]

 The evidence discloses that 42 states and the District of Columbia, who had made Medicaid payments under their respective state programs to SBCL, negotiated separate settlements with SBCL. Because SBCL sought a "global settlement" for the alleged billing fraud claims, the amount to be paid to the states was factored into the overall $325,000,000 settlement. It is clear that the Government never received and never intended to receive the full $325,000,000. All parties were well aware of this. Although there is no direct mention of separate payment amounts to the state Medicaid Fraud Control Units in the Settlement Agreement or the Release, the fact that the states were simultaneously settling their claims was expressly set forth in the Settlement Agreement. Preamble G of the Settle-

ment Agreement specifically refers to the submission of Claims for payment by SBCL to the Medicaid programs of the expressly enumerated 42 states and the District of Columbia. Preamble Q, however, specifies that the Government contends that all of the alleged fraudulent payments, including the Medicaid program payments to the states constituted submission of false claims under the Federal False Claims Act. Paragraph 4 of the Settlement Agreement refers to "receipt of the payment described in Paragraph 1 above [$325,000,000] by the United States and the State Settlement Account, collectively." Paragraph 6 of the Settlement Agreement provides that the Relators (all of whom signed the Settlement Agreement) "will release, upon receipt of the payment described in Paragraph 1 above by the United States and the State Settlement Account, collectively, in accordance with the Court Order, SBCL. . . ." Consequently, it is clear that the Relators were well aware that payment would be made directly to the enumerated states out of the total $325,000,000 settlement recovery. They knew, at least when the order of distribution was entered, if not before, the exact amount that was to be paid to the states.

I do not agree, however, with what I understand is the Government's present position, that a federal cause of action under the False Claims Act for the payments to the states for their share of the Medicaid payments, could not be maintained. That is inconsistent with the Government's contentions set forth in Preamble Q to the Settlement Agreement cited above.

Medicaid programs, although authorized by federal law and supported by federal contributions to the states, are not strictly federal government programs. They are state programs authorized and partially financed by federal law. A false claim

25. Apparently because of a few days extra interest earned under item (4) of the order, the actual amount paid to the Medicaid Fraud Control Units was $14, 507,107, and the total settlement proceeds, with interest was $333,976,266. These later two figures will be used for all further calculations of the qui tam shares.

submitted to and paid by a state's Medicaid program indirectly results in a loss to the federal government, but it is not strictly speaking, a false claim submitted to the United States. A qui tam share may be obtained from the Government only out of the proceeds of the settlement received by the Government. The Government's net recovery was, as above noted, $319,469,159. That is the total proceeds upon which the qui tam shares will be determined.

I recognize that this determination is arguably inconsistent with the determination that the various claims against SBCL set forth in the qui tam complaints may not be subdivided and quantified as to amounts. The amounts that were paid to the states under the Medicaid programs are definite and they were incorporated in an order of court. They were funds that the Government never received and never were entitled to receive. The amounts paid to the states were negotiated separately and separate agreements and releases were signed by each of the effected states and SBCL.

I note that the Government, the Relators and SBCL entered into a stipulation, prior to the Relators agreeing to the settlement, that both the Government and the Relators reserved the right to contend, "that funds paid to any state are or are not subject to any claim for a relator's share." As to this issue, it appears that the Government's present position comes as no surprise to the Relators.

The Relators Contend that they are entitled to a qui tam share of that portion of the proceeds received by the states, because, in the words of the Relators, those payments were made as "a unilateral determination of the Government." I disagree with that characterization. The qui tam award that will be made will be calculated on the total proceeds received by the Government, after deducting the amount received by the states.

### 6. *The "no more than 10 per cent qui tam share" issue*

The most perplexing issue under the statute is whether the "no more than ten percent of the recovery" award is applicable. Neither the Relators nor the Government were clear as to their respective interpretations of this section of the statute.

31 U.S.C. § 3730(d) provides in relevant part:

> (d) Award to Qui Tam plaintiff.—(1) If the Government proceeds with an action under subsection (b), [as it did in this case] such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the Claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation.

The problem arises, because the statute in almost identical language in sub-section (e)(4)(A) provides that unless the qui tam Relator is an "original source", as expressly defined in the statute, "no court shall have jurisdiction over" a qui tam action that is "based upon public disclosures" of the same type that triggers the "no more than 10 percent" award provision. The Government has argued that sub-section (e)(4)(A) forecloses both the Merena and Robinson Relators from any award on the

automated chemistry allegations and alternatively, but I believe inconsistently, alleges that sub-section (d), quoted above, limits any award on the automated chemistry allegations to the "no more than 10 percent" range, and suggests that the percentage should be in the low range between zero and ten percent.

Arguably, the "no more than 10 percent" award could apply in every case, if the court makes the finding that "the *action* [not specific allegations of the action] is based *primarily* on disclosures of specific information" (underlining added) of the type therein defined. The Government, in argument, suggested that the distinction between the two apparently conflicting sections, is that the "no more than 10 percent" subsection specifies "disclosures", whereas the jurisdictional bar sub-section refers to "public disclosures". I do not think this distinction is valid, because, for example, there could hardly be a disclosure "from the news media" that was not a public disclosure. To the extent that the Government suggests that there might be a non-public disclosure to the Government by some inter-governmental investigation, allowing a recovery of no more than 10 percent, the statute can not be reasonably so interpreted. One of the clearly enunciated purposes of the most recent 1986 amendments to the statute, was to prevent the harsh preclusive effect of mere governmental knowledge or investigation as occurred in *United States ex rel, Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir.1984). *See United States ex rel, Stinson v. Prudential Insurance Company*, 944 F.2d 1149, 1163 (3d Cir.1991) (Scirica, J., dissenting).

The Relators explanation of the "no more than ten percent" clause in sub-section (d) appears to be that where an action would be subject to dismissal for lack of jurisdiction under the public disclosure bar, sub-section (e)(4)(A) and (B), but the Government nevertheless intervenes, the Relator would then be entitled to a percentage up to ten percent "taking into account the significance of the information

and the role of the person bringing the action in advancing the case to litigation." Relators further contend that the jurisdictional "public disclosure" bar and the "original source" exception have no application once the Government intervenes. This is a plausible explanation for the seemingly contradictory clauses of the statute.

The Relators contend, as they have throughout this litigation, that, it any event the "public disclosure bar" has no application to their qui tam actions. Factually, they contest vehemently the nature of any public disclosures, including the broadcast in the television show *60 Minutes*, of "allegations or transactions" on which their actions "are based." Both Relators Merena and Robinson deny that any of the allegations of fraud which they set forth in their respective complaints relied in any way upon any disclosures made by others, whether public or private. Both contend that their allegations were based upon their firsthand personal knowledge acquired while employees of SBCL: Relator Robinson as the Medical Director of an SBCL laboratory in San Antonio, Texas and Relator Merena, as a billing analyst and Supervisor of Response Development at SBCL's national headquarters. Although some of the allegations in both complaints may have been similar to those upon which the Government successfully prosecuted NHL, there were many allegations encompassed, even within the "automated chemistry" claims that had not been included in any Prior disclosures to the Government, whether or not public.

 The purpose of the "public disclosure bar" would appear to be intended to prevent a person taking advantage of and using publicly disclosed information, and to prevent the filing of "copy cat" complaints. If "based upon" means or is similar in meaning to "relied upon", neither Relator's complaint was based upon any disclosures, other than those that they learned as employees of SBCL. Again I note that the "public disclosure bar" of sub-section

(e)(4)(A) and (B), refers to an "action" being barred, not to certain allegations. Certainly the qui tam complaints were not subject to dismissal, even had the Government timely so moved. As I have heretofore noted, I will not dismiss or separate out various claims, including the "automated chemistry" claims, in determining an appropriate qui tam share.

The "no more than ten percent" provision of subsection (d) requires that *the court find* that the "action" be based *"primarily* on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." I decline to make such a finding, irrespective of whether the "disclosures" must be public.

I conclude that the Relators, whether singly or in combination are entitled to a qui tam award in the 15 to 25 percent range on the net proceeds of the settlement. Those net proceeds are calculated as follows: Total recovery of the settlement and accrued interest, $333,976,266.40, less the total amount paid to the states Medicaid Fraud Units, $14,507,107, leaving a net balance of $319,469,159.40. In computing the proceeds upon which the Merena–Robinson Relators will be entitled to receive a share, there must be further deducted the amount of the agreed allocation to the Spear Relators of $13,297,829. This leaves a balance of proceeds of $306,171,330 upon which the disputed qui tam shares will be Calculated.

### 7. *Relators' Contribution to the Prosecution of the Action*

At the seven-day hearing in March, 1996, Relators Merena and Robinson presented evidence supporting their claims for a larger percentage of relators' share.

The Government presented evidence to support their own arguments that the Relators are barred from recovery on the automated chemistry claims, and that the Relators contributed only minimally to the investigation of and settlement with SBCL on their other allegations.

Relator Merena has worked voluntarily with the Government for the last four years to secure a settlement in the qui tam cases against SBCL. While he was still employed as the supervisor of Response Development at SBCL, he provided the Government with information and documents for eighteen months after he filed his qui tam action. He continued to assist the Government in its investigation of SBCL for two years after the unsealing of his qui tam action, and after he left his employment at SBCL in March of 1995. The Government does not dispute that Relator Merena spent literally hundreds of hours assisting the Government at the Philadelphia Task Force's Media, Pennsylvania headquarters.

Relator Merena alleges that he first contacted the Government about what he suspected were fraudulent billing practices at SBCL in mid-August 1993 when he voluntarily placed a call to a toll-free government fraud alert hotline. Apparently, Relator Merena's phone call was routed and re-routed until he finally was referred to the United States Patent Office. The United States Patent Office, in turn, directed Relator Merena to James Sheehan, Chief, Civil Division of the United States Attorney's Office for the Eastern District of Pennsylvania.

Mr. Sheehan testified at deposition [26] that he did not take any notes to memorialize this phone call, but that he recalled an anonymous caller phoning in about the alleged fraud at SBCL. At deposition, Mr. Sheehan testified that he remembered that during his telephone conversation with Relator Merena, Relator Merena discussed

---

**26.** Mr. Sheehan testified at deposition, but was not called as a witness in open court during the evidentiary hearing which began on March 16, 1998.

the fact that he was an employee of SBCL, and that he had concerns about the way the company was operating. Mr. Sheehan testified that Relator Merena thought that there might have been grounds to address SBCL's activities under the False Claims Act. Mr. Sheehan recalled that Relator Merena expressed concern about identifying himself. Mr. Sheehan recalls at least two other telephone contacts with Relator Merena after the initial phone call and before Relator Merena's counsel, Mr. Marc Raspanti, became involved.

Prior to any face-to-face meeting between Relator Merena and Mr. Sheehan, Relator Merena's counsel, Mr. Raspanti, provided Mr. Sheehan with information concerning a number of schemes ongoing at SBCL. The information provided included schemes to maximize Medicare revenues by "unbundling" or "exploding" its various test panels, including its automated chemistry panels.

Relator Merena's first face-to-face meeting with Mr. Sheehan was on October 9, 1993. Relator Merena's counsel, Mr. Raspanti, also was present. At this meeting, Relator Merena voluntarily provided additional information to Mr. Sheehan concerning SBCL's alleged fraudulent billing practices. Relator Merena explained his background and employment at SBCL. He began working at SBCL in 1986 as the Supervisor of the Third–Party Billing Department. Relator Merena moved up in the company, and was at the time he contacted Mr. Sheehan, supervisor of Response Development, where he handled SBCL's receipt of payments from Medicare and other payors. Relator Merena spent his entire career with SBCL working at its national headquarters.

At deposition, Mr. Sheehan testified that during this October 9, 1993 meeting, Relator Merena provided him with the names of various individuals who headed various functions at SBCL and with an overview of SBCL's operations throughout the country. Relator Merena indicated to Mr. Sheehan certain of SBCL's laboratories that he believed were involved in questionable acts, and he indicated to Mr. Sheehan certain parts of the country he thought would be most fruitful to the Government's investigation based on his experience at SBCL's national headquarters. Relator Merena described SBCL's National Billing Group, and SBCL's relationship with Pennsylvania Blue Shield ("PBS"), and he provided the names of employees of PBS and SBCL who were interacting with each other as to some of his allegations.

Relator Merena explained in detail how SBCL's "unbundling" or "exploding" scheme worked. He described that SBCL was looking for ways to maximize revenues, and that it attempted to do so by identifying laboratory tests which could be separated out from the standard multi-channel battery of tests. He explained that individual states differed in how they paid SBCL for additional tests, and therefore SBCL could submit claims for unbundled tests to certain states and receive payment for the multi-channel battery of tests (the bundle) and bill again for certain tests which were already billed as part of the battery.

Relator Merena explained the unique test billing codes used by SBCL's laboratories and explained how the National Billing Group converted the laboratory codes in a way that improperly inflated Medicare revenues. He explained that SBCL even hired procedure code analysts whose job it was to maximize revenue for test panels, including automated blood chemistry panels.

Relator Merena explained SBCL's centralized computer billing systems. He described SBCL's scheme of "jamming" diagnosis codes, whereby SBCL's computer automatically added other diagnosis codes for particular claims where specific diagnoses are required. He stated that, in this way, SBCL obtained Medicare payment without obtaining necessary diagnosis information from the referring physician. He explained SBCL's alleged deceptive

marketing schemes. Relator Merena also discussed and explained SBCL's alleged practices of billing for tests which were not performed, improper billing for End Stage Renal Disease ("ESRD") patients, multiple kickback schemes used to entice referring physicians, and a particular diagnosis scheme related to pap smears. The October 9, 1993 meeting lasted about seven hours.

Prior to Relator Merena's suit, the Government had, in December 1992, concluded an investigation of NHL, which resulted in NHL pleading guilty in the United States District Court for the Southern District of California of submitting false claims to the Government and paying a $1 million criminal fine. The president of NHL also pleaded guilty to felony counts of submitting false claims to the Government and served a prison sentence. Additionally, NHL agreed to a civil settlement of $100 million with the Government and paid ·a monetary settlement to 33 individual states.[27]

By way of declaration, Carol Lam, Assistant United States Attorney for the Southern District of California, states that the issue in the NHL investigation was NHL's alleged practice of routinely adding non-medically necessary tests to automated chemistry panels and billing government health insurance programs separately for those added-on tests. Allegedly, NHL used deceptive marketing practices that lead physicians ordering laboratory tests to believe that the additional test results they were receiving with the automated chemistry panels came at little or no additional cost. Ms. Lam testified, by way of declaration and in open court, that during the course of the NHL investigation, the team of government agents and lawyers learned that the scheme at NHL was not unique to NHL, and began to suspect that many of NHL's competitors were also committing similar marketing and billing fraud. Ms. Lam testified that after the resolution of the NHL investiga-

tion, in late 1992, she and Mr. Freedman discussed the need to investigate and prosecute, where appropriate, the other major medical laboratories in the country, including SBCL.

Following the resolution of the NHL investigation, the Government gave press releases and its officials, including Ms. Lam made comments and statements in various forums, including television and the print media as well as at professional conferences, regarding the Government's investigation of NHL and its suspicion that fraudulent billing practices by medical laboratories were not unique to NHL. In December, 1992, numerous articles appeared in newspapers and industry publications across the country. The general gist of these articles was that the alleged billing practices at NHL were not unique to NHL, and that federal officials were continuing to investigate the marketing and billing practices of other national medical laboratories.

The successful NHL investigatory team evolved into a task force. · This task force decided to commence a joint criminal, civil and administrative investigation of the seven other national laboratories. In the early summer of 1993, the task force became known as Operation LABSCAM or the LABSCAM Task Force. During the summer of 1993, the LABSCAM Task Force requested from the Program Integrity Branch of the Health Care Financing Administration ("HCFA"), all available national clinical laboratory ˙ billing data. HCFA provided the task force with tapes of billing data for 1991 through 1993. The data provided included laboratory claims submitted to Medicare for all laboratory tests by seven major medical laboratories including SBCL. From this data, Ms. Lam testified that the LABSCAM Task Force was able to identify numerous potential billing schemes by SBCL.

When asked on cross-examination about the Philadelphia Task Force's contribution

27. The NHL case also was a qui tam action.

to the case, Laurence Freedman, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice ("DOJ"), responded that he, and others at the DOJ in Washington, DC, did not know what the Philadelphia Task Force was doing in relation to these cases. He testified that the Philadelphia Task Force did not even know much about the case.

Both Assistant United States Attorney Lam and Freedman testified that up until the summer of 1993 the Government had been tracking anomalies and indicia of fraud as it related to SBCL's billing practices. Lam testified that the investigation into SBCL's billing practices began on August 24, 1993 with the issuance of subpoenas to seven medical laboratories, including SBCL.

On August 24, 1993 the Department of Health and Human Services' Office of Inspector General (HHS–OIG) Office of Audit Services issued Comprehensive subpoenas to SBCL and six other medical laboratories. The Government received over 200 boxes of documents in response to its initial subpoena issued to SBCL. Federal Bureau of Investigation ("FBI") Special Agent Jacob Gregory of San Diego reviewed the SBCL documents and came up with documents which he thought would be helpful in prosecuting a Case against SBCL for its alleged fraudulent billing practices. These subpoenaed documents later became known as "hot documents" or "the hot documents file." From these so-called "hot documents", Special Agent Gregory also compiled a table of contents and created a time line setting forth critical dates of the SBCL alleged scheme.

The DOJ made the decision to transfer the investigation of SBCL to the Eastern District of Pennsylvania. In accordance with this decision, Special Agent Gregory re-boxed the documents, time line, and table of contents and sent them to federal investigators in this district, sometime in July, 1993.

By August, 1993, media coverage of the alleged billing fraud in the medical laboratories industry continued. An article dated August 28, 1993, and headlined, "Medical Labs Subpoenaed in Medicaid–Medicare Probe", was distributed by the Associated Press wire service and was published in the *Washington Post* stating that some of the nation's leading medical testing laboratories had recently received federal subpoenas seeking documents for a "widening investigation of Medicaid and Medicare fraud". The article mentioned SBCL by name as being among those receiving a subpoena. The story of the Government's subpoena of documents from the seven major laboratories was picked up by other newspapers and industry publications. On September 19, 1993, CBS News broadcast a segment entitled "Blood Money" on its show *60 Minutes.* The story, reported by Leslie Stahl, covered the alleged fraud involving automated chemistry panels. The show's Associate Producer Karen Jaffee went to SBCL with an order for an automated chemistry panel, a CBC, and thyroid test. On camera, Stahl and a medical doctor examined the bill generated by SBCL. The bill included an un-ordered but billed magnesium test.

By the end of 1993 the Government alleges that, in addition to the attorneys assigned to the investigation, there were six full-time federal agents from the FBI and the Defense Criminal Investigative Service ("DCIS"), and a full-time paralegal supervisor assigned to the LABSCAM Task Force. It is the Government's contention that its investigation of SBCL's alleged fraudulent billing practices was well on its way at the time Relator Merena filed his complaint, and even before he made his first contact with Mr. Sheehan. More importantly, the Government argues that its knowledge of the alleged fraud, its ongoing investigation, and the public disclosures of these facts constitute public disclosures for the purposes of the False Claims Act and therefore constitute a bar

to any recovery by Relator Merena and other relators.

Relator Merena testified in open court, however, that he did not view the *60 Minutes* segment, nor did he read any of the numerous newspaper articles, press releases or industry publications. He contends that the allegations he made in his complaint were based on facts of which he has independent knowledge. He claims his allegations and the facts supporting them, therefore, are based on his knowledge and not on the disclosures of the Government's investigation into or suspicions of alleged fraudulent billing practices at SBCL.

Both Lam and Freedman testified that the information the Government had in the summer of 1993, at the time of the issuing of the subpoenas as well as the documents and other information the Government received in response to the subpoenas was insufficient for the Government to go forward and successfully prosecute a case against SBCL for violations of the False Claims Act. Nonetheless, the Government contends that its investigation and resolution of the NHL fraud case provided a blueprint that was easy to follow in its subsequent investigations of the other national medical laboratories, including SBCL. Ms. Lam testified in open court that once the Government understood the fraudulent schemes by NHL, the Government felt it would not be "rocket science" to uncover the same or similar schemes at the other laboratories. It is the Government's contention, therefore, that any investigation of SBCL would be more or less a matter of following a well laid out map.

Relator Merena argues, however, that if the Government had sufficient information at that time, settlement would not have taken four years to conclude. Relator Merena contends that the Government, by trivializing the extent to which Relator Merena contributed to the Government's investigation of SBCL, has minimized the contribution of the entire Philadelphia Task Force in settling the qui tam actions against SBCL.

In addition to the assistance Merena provided through October 9, 1993, at his first face-to-face meeting with the Government, Relator Merena made other significant and substantial contributions which led to the Government's ultimate settlement with SBCL. Relator Merena reviewed documents received from SBCL in response to three subpoenas, two of which he was helpful in preparing. Specifically, he helped the Government understand many of the internal documents received from SBCL in response to the subpoenas. He assisted FBI and LABSCAM Task Force agents in preparing for interviews of witnesses. He prepared outlines for interviews with witnesses. He assisted the task force in evaluating and reviewing the notes after the witness interviews were completed. He assisted in obtaining documents, many of which he fed to the Government during the eighteen months he was still an employee at SBCL. He assisted in preparing Government agents for the re-interview of witnesses. He provided technical support himself and legal support through his counsel to the Government in drafting subpoenas and key documents. He and his counsel provided assistance in the settlement process, and helped to put pressure on SBCL to reach a settlement of the case. He filed a qui tam action here in the United States District Court for the Eastern District of Pennsylvania where the other qui tam actions against SBCL ultimately were transferred and settled.

It is undisputed that on November 8, 1993, counsel for Relator Merena provided Mr. Sheehan with a draft of Relator Merena's qui tam complaint, and on November 12, filed a qui tam complaint under seal in this court. His complaint alleged fraud by SBCL in SBCL's automated chemistry panels, urinalysis tests, prostate antigen tests, pap smear tests, tests performed for ESRD patients, tests not performed, and kickbacks. On the same day, Relator Merena provided the Government with his initial Notice of Disclosure. On December 13, 1993, Relator Merena provided the

Government with his first Supplemental Disclosure Statement which supported each of the claims raised in Relator Merena's earlier meetings with the Government, as well as those in his qui tam complaint.

Mr. Sheehan sought the assistance of Relator Merena and his counsel in drafting document requests that the Government could serve on SBCL. On March 7, 1994, Relator Merena provided the Government with information about SBCL's Lexington, Kentucky laboratory's practice of artificially reducing its Medicare accounts receivables by "jamming", or automatically adding, diagnosis codes to Medicare claims to facilitate their payment. On March 8, 1994, Relator Merena provided the Government with an annual recap of SBCL's 1993 results. On March 17, Relator Merena provided the Government a complete set of SBCL's 1993 monthly Billing and Accounts Receivable Reports. On March 21, 1994, Relator Merena provided the Government a summary of individuals and documents pertaining to SBCL.

Relator Merena met with Government officials on March 21, 1994. This meeting was arranged at the request of Mr. Sheehan. During this meeting, Relator Merena carefully explained to Mr. Sheehan how SBCL manipulated its billing for automated chemistry profiles in order to maximize reimbursement. Specifically, Relator Merena explained how SBCL separately billed certain tests, including the HDL, LDL, and RDW tests to the Atlanta, Georgia and Florida Medicare carriers to obtain greater Medicare reimbursement than if SBCL would have submitted those claims to PBS.

On April 29, 1994, Relator Merena's counsel, Mr. Raspanti, provided the Government with drafts of detailed and comprehensive subpoenas. On May 5 and May 6, 1994, Relator Merena provided the Government with copies of all documents previously provided to the United States Attorney's Office for the Eastern District of Pennsylvania. On May 11, 1994, Relator Merena provided to the Government an internal SBCL directory which listed key personnel for each of SBCL's laboratories.

On June 22, 1994, Relator Merena and his counsel met with various Government officials in a meeting lasting approximately four hours. At this meeting, Relator Merena discussed and identified numerous SBCL employees, as well as former SBCL employees, describing who were likely to be cooperative witnesses and who would have the most relevant information about SBCL's various practices and schemes nationwide.

Also in the summer of 1994, Relator Merena and his counsel assisted the Government in drafting a letter to SBCL regarding a May 11, 1994 subpoena which Relator Merena and his counsel also helped draft. Relator Merena, at the Government's request, provided additional assistance concerning SBCL's "jamming" of diagnosis codes for pap smear tests and test performed on ESRD patients. Relator Merena also further described and provided documentation regarding SBCL's kickback scheme.

Throughout the investigation, the Government made repeated representations to him that he was a big help to the investigation of SBCL, and that the information he was providing was very useful. Relator Merena contends, and the Government agrees, that Relator Merena's counsel asked Mr. Freedman of the DOJ repeatedly about what the DOJ's position would be with regard to the relators' share.

It is undisputed that, after the Government reached the settlement in principle with SBCL, it asked Relator Merena and his counsel to summarize what they believed to be a basis for the fair and adequate resolution of relators' share issues. Relator Merena provided a detailed 45–page letter setting forth his contribution to the investigation and settlement of the case. (Merena Exhibit 70).

On March 22, 1996, Relator Merena, his counsel, and other Relators and their counsel, met with Mr. Sheehan, Mr. Freedman

and another Government official at the Government's request to discuss the settlement in principle with SBCL. It is undisputed that at the outset of the meeting, Mr. Sheehan congratulated counsel for the Relators and told them the Government was extremely appreciative of their assistance and efforts in bringing about the successful settlement of this case, which the Government claims is the most successful qui tam case in the history of the United States. The Government acknowledged the hundreds of hours Relator Merena and his counsel spent assisting the Government in achieving this settlement.

Relator Merena contends, however, that the Government never indicated at this meeting nor at any time prior to this meeting, that the Relators would not recover the statutory relators' share of the total settlement proceeds, or that the Government would seek to preclude Relators from recovery on certain of their allegations. Relator Merena contends that the Government never told the relators what their relators' share would be, but that the Government would be fair to the relators.

The Government, on the other hand, contends and Mr. Freedman so testified in open court, that if the Relators objected to the settlement proceedings and/or agreement in principle, they could have said so. The Government, in essence, contends that the Relators should have raised the issue of their shares themselves prior to agreeing to the settlement with SBCL.

Relator Robinson argues that he, too, substantially contributed to the investigation of and settlement with SBCL. From 1990 to 1993, he was the medical director of SBCL's San Antonio regional laboratory. He resigned his position at SBCL on June 1, 1993, after concluding that the company's alleged practice of "unbundling" or "exploding" its charges to federal health care programs was deliberate, and that he could not effect, from within, a change in the company's policy.

In May, 1993, he met with Relator Grossenbacher, an attorney, and discussed SBCL's alleged fraudulent policy and practices. Relator Grossenbacher then contacted DCIS Special Agent Larry Daniels about SBCL's alleged fraudulent policy and practice of unbundling charges to the Government for component parts of its automated chemistry panels.

It is uncontested that on or before June 6, 1993, DCIS Special Agent Daniels briefed fellow agent Scott Parker, who was investigating health Care fraud matters in Texas, on the information Special Agent Daniels had received from Relator Grossenbacher. On June 8, 1993, Relator Grossenbacher discussed with Special Agent Parker, SBCL's alleged nationwide policy and practice of unbundling charges for its automated chemistry panels. He claims that he provided Special Agent Parker with at least five documents which evidenced SBCL's alleged schemes, and that Special Agent Parker added these documents to his investigative file. Apparently, the information and evidence he and Relator Grossenbacher provided to Special Agents Daniels and Parker was the first specific information disclosed to the Government regarding SBCL's policy and practice of "unbundling" charges to federal health care programs for iron, TIBC, HDL, LDL, and magnesium tests.

It is uncontested that in mid–July 1993, Special Agent Parker opened a separate investigative file on SBCL with the information and documents that he had received from Relators Robinson and Grossenbacher. Relators Robinson and Grossenbacher filed their complaint on December 15, 1993, and on that same date, delivered to the Government material evidence and information in support of the complaint.

On April 20, 1994, Relator Robinson met with Mr. Freedman, FBI Special Agent Gregory, and DCIS Special Agent Parker. During this meeting, he was interviewed at length regarding his knowledge of SBCL's unbundling policies and practices including the billing and marketing of SBCL's labo-

ratory services. He was questioned about his career at SBCL, and of how he came to be aware of SBCL's alleged fraudulent practices. When asked for the names of current and former SBCL employees knowledgeable about SBCL's marketing of and billing for automated chemistry tests, Relator Robinson provided names of current and former employees he felt might be helpful to the investigation. At least one of these individuals was interviewed by the Government. Relators Robinson's and Grossenbacher's cases were later transferred to this court.

At Mr. Freedman's request, Relator Robinson came to Philadelphia for a meeting held on November 29, 1995. At that meeting Government officials advised Relators and their counsel that the Government was looking for litigation support from the relators and their counsel, and the Government officials discussed with Relator Robinson the testimony they anticipated from SBCL's medical experts. The Government indicated that it intended to call Dr. Robinson as an expert witness to controvert the anticipated testimony of SBCL's medical experts. At this meeting, the Government also questioned him more about the operations at SBCL, including quality assurance and compliance issues, and recordkeeping practices.

It is uncontested by the Government that, upon returning to Texas, Relators Robinson and Grossenbacher and their counsel spent many hours analyzing SBCL's responses to the unbundling issues and preparing a written rebuttal of SBCL's arguments in a 13–page letter that was sent to the Government on December 12, 1995.

### 8. *The Merena – Robinson qui tam shares*

The Government insists that I must decide which Relator is entitled to a qui tam share, and preclude the other from receiving anything, on the basis of "the first to file bar." Such an analysis and decision might be required if the Merena and Rob-

inson Relators were arguing between themselves as to who should receive the qui tam award. Fortunately, and quite practically and sensibly, the Relators, long before this litigation began over the amount of the qui tam share the Government would have to pay, agreed among themselves as to the division of any proceeds, regardless to whom the award or awards were made. Therefore, I do not think it is necessary to decide that one Relator and not the other is entitled to a share.

Because both cases were settled for an overall sum, as heretofore noted, there is no way to quantify or to separate the recoveries between or among the qui tam Realtors. Because the Government never sought to dismiss any of the actions or any claims of the actions until after the settlement was completed and the cases were dismissed with prejudice, it is conceivable that each of the three qui tam Relators could have plausibly argued that each was entitled to a percentage between 15 and 25 percent of the entire proceeds. It is clear that the qui tam statute contemplated no more than one recovery. Relators seek nothing more than this. I will decide the percentage between 15 and 25 percent that should be awarded on the net proceeds.

Undoubtedly both Relators provided very valuable and substantial assistance to the Government in bringing these actions to a successful settlement and termination. A brief synopsis of the assistance has been outlined above. There was much more, but it would gain little to recite in full detail. The sole statutory criterion for an award is "the extent to which the person [qui tam Relator] substantially contributed to the prosecution of the action." In the final analysis, this can be no more than a judgment call by the decision maker. There is no precise way to quantify in a percentage the contribution of a qui tam Relator. This is particularly true, it seems to me, in a case where the actions are terminated by an overall settlement. There is no way of determining on the

record before me how much monetary value, if any, was added to the potential settlement when the cases were partially unsealed, and SBCL became aware for the first time of the identities of the qui tam "whistle-blowers." Likewise there is no way to quantify how much sooner the actions settled because of the assistance and persistence of the Relators. The evidence is strong, however, that it was the Relators who constantly urged to Government to enter into serious negotiations with SBCL.

I recognize that the Government would probably have continued to pursue at least the "automated chemistry" claims against SBCL, and would very likely have obtained a substantial settlement. How much such a settlement would have been without the assistance of Relators would be pure speculation. Relators had deep and extensive knowledge of the inner workings of SBCL and they were able to obtain, provide and more importantly interpret corporate billing records, without which the cases would have had serious problems.

As to the "Merena only" claims, in an earlier filing the Government suggested a qui tam award of 16 percent on the amount it allocated to those claims. The Relators suggest that they should be entitled to an overall share of 18 percent of the total proceeds, including the proceeds to the states that I have declined to include.

Whether we consider only the individual contributions of Merena or the individual contributions of the Robinson Relators, certainly some percentage above the minimum 15 percent should be awarded. Both Relators substantially contributed, and were willing to contribute as much as the Government was willing to receive. I conclude that the substantial contribution of each was equal to that of the other. Thus if only one, but not the other qui tam Relator would be entitled to an award on the whole of the proceeds, I would award the same percentage regardless of which one was entitled.

In reading the depositions and evidence received into evidence, and listening to the arguments of counsel, I am left with the impression that the attorneys in charge of the LABSCAM investigation, conducted largely from San Diego and Washington, DC by the DOJ seek to take far more credit for the overall success of the proceedings than is rightly due. The suggestion has been presented that San Diego and Washington took care of all the automated chemistry investigation and claims, which the Government contends was the most valuable part of the case, and that the United States Attorney's office in the Eastern District of Pennsylvania, through Mr. Stiles, the United States Attorney, and Mr. Sheehan, an Assistant United States Attorney, and the investigators working under their direction played only a minor part in bringing about the successful Conclusion of the actions. Perhaps the reason the litigation has been presented in this light is because the contacts that Relator Merena, and, to a large extent, Relator Robinson had with the Government was in providing assistance to the investigators and United States Attorneys from this district, and the Government wants to minimize the contributions of the Relators in order to lower their ultimate award.

No matter how the qui tam award in this case is calculated, it will be quite large. I recognize that some of the arguments presented by the Government attorneys may have been caused by a sincere desire to save as much of the proceeds as possible for the Government. However, an Act of Congress provides for substantial awards in order that persons who acquire first-hand knowledge of false claims being presented to the Government will come forth and file meritorious qui tam complaints. The success of this legislation in continuing to achieve its goals can only be assured by unstintingly providing the qui tam awards dictated by Congress, irrespective of the size of the awards.

Relators undoubtedly sincerely believe that their respective contributions toward

bringing about the overall settlement were not only substantial but vital to the highly successful outcome of the actions. They therefore may have exaggerated to some extent the importance of their individual contributions. Similarly, I am convinced that the Government through the DOJ has greatly underestimated and minimized the help provided by the Relators. I believe that the DOJ attorneys who have represented the Government in the present qui tam relator share proceedings have been largely unaware of the tremendous effort put forth by the United States Attorney's Office for this district. That office and its investigative staff relied very heavily upon the aid of the Relators, particularly upon Mr. Merena. It was primarily through the insistence of both the Relators and Mr. Sheehan that serious and meaningful settlement negotiations were commenced. It is quite clear that the automated chemistry claims were not investigated and developed solely by the LABSCAM task force. The development of the total facts as to all of the claims asserted by the qui tam complaints of Merena and Robinson, including the automated chemistry allegations, were developed primarily through the task force operating out of the Media Office of the United States Attorney's office in this district.

 The ultimate decision as to the percentage share to be awarded is my own overall assessment of the extent to which Relator Merena and/or the Robinson Relators substantially contributed to the successful prosecution and settlement of the actions. As previously noted, some percentage above the 15 percent minimum amount is entirely appropriate in this case. In my judgment a qui tam share of 17 percent of the net proceeds of $306,171,330 is proper. Other persons who might make a similar decision based on the same facts, might well provide a larger or a smaller percentage.

The net proceeds upon which the qui tam share will be computed is, as previously set forth, $306,171,330. Seventeen percent of that amount is $52,049,126. From that amount there must be deducted the amount of the partial summary judgement awarded of $9,736,324.[28] A judgment will be entered in favor the Merena– Robinson Relators, jointly, in the sum of $42,312,802.

All factual statements contained in this opinion shall be deemed to be findings of fact. In addition, all of the submitted unopposed proposed findings of fact presented by either of the Relators and by the Government, shall be deemed as additional findings of fact.

Perhaps Congress never contemplated that such large awards might occur, although that seems doubtful. Congress is, of course, capable of amending the statute at anytime, should it consider that it has been too generous in specifying the percentages to be awarded. If so, Congress might also be more helpful in defining when the lesser percentage ranges should be utilized and also in clarifying the several seemingly unclear and conflicting sections of the statute.

For the reasons set forth in this opinion judgment will be entered in favor of the Merena and the Robinson relators jointly in the sum of $42,312,802, for the balance of their qui tam shares.

### JUDGMENT

For the reasons set forth in the accompanying opinion, Judgment is entered in favor of the Relators, Robert J. Merena in Civil Action 93–5974 and Glenn Grossenbacher and Charles W. Robinson in Civil Action 95–6953, jointly and against the United States of America in the sum of $42,312,802.

It is further ORDERED that any and all pending motions in Civil Actions 93–

---

**28.** The Government has paid the amount of the partial summary judgment to Relator

Merena.

5974, 95–6953 and 95–6551 not otherwise expressly ruled upon in the accompanying opinion are DENIED.