

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-2007

# Bogart v. King Pharm

Precedential or Non-Precedential: Precedential

Docket No. 06-2098

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Bogart v. King Pharm" (2007). *2007 Decisions*. Paper 661.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/661

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-2098
_____

UNITED STATES OF AMERICA
ex rel. EDWARD BOGART;
EDWARD BOGART, individually;
STATE OF ILLINOIS
ex rel. EDWARD BOGART;
STATE OF CALIFORNIA
ex rel. EDWARD BOGART;
STATE OF FLORIDA
ex rel. EDWARD BOGART;
STATE OF TEXAS
ex rel. EDWARD BOGART;
STATE OF MASSACHUSETTS
ex rel. EDWARD BOGART;
STATE OF TENNESSEE
ex rel. EDWARD BOGART;
STATE OF DELAWARE
ex rel. EDWARD BOGART;
STATE OF NEVADA
ex rel. EDWARD BOGART;

*(cont'd)*

STATE OF LOUISIANA
ex rel. EDWARD BOGART;
STATE OF HAWAII
ex rel. EDWARD BOGART;
DISTRICT OF COLUMBIA
ex rel. EDWARD BOGART;
STATE OF VIRGINIA
ex rel. EDWARD BOGART;
STATE OF NEW MEXICO
ex rel. EDWARD BOGART

v.

KING PHARMACEUTICALS;
MONARCH PHARMACEUTICALS;
WYETH PHARMACEUTICALS;
AMERICAN SERVICE GROUP;
PRISON HEALTH SERVICES

Edward Bogart,
                                    Appellant
            _____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-01538)
District Judge: Hon. Marvin Katz
            _____

2

Argued on May 8, 2007

Before: RENDELL and JORDAN, Circuit Judges,
and VANASKIE,* District Judge

(Filed: July 16, 2007)

Samuel L. Boyd
Boyd & Associates
6440 North Central Expressway, #600
Dallas, TX   75206

Carl A. Solano   **[ARGUED]**
Jennifer J. Nestle
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA  19103

Timothy K. Lewis
Schnader Harrison Segal & Lewis
Suite 300
2001 Pennsylvania Avenue, NW
Washington, DC   20006
     *(cont'd)*

---

*The Honorable Thomas I. Vanaskie, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

3

Joel M. Androphy
Berg & Androphy
3704 Travis
Houston, TX   77002

*Counsel for Appellant*
*Edward Bogart*

Michael T. Reynolds   **[ARGUED]**
Cravath, Swaine & Moore
825 Eighth Avenue
Worldwide Plaza
New York, NY   10019

John G. Harkins, Jr.
Eleanor M. Illoway
David W. Angstrom
Harkins Cunningham
2005 Market Street
2800 One Commerce Square
Philadelphia, Pa  19103

*Counsel for Appellees*
*King Pharmaceuticals;*
*Monarch Pharmaceuticals*

*(cont'd)*

4

Guy W. Horsley, Jr.  **[ARGUED]**
Office of Attorney General of Virginia
900 East Main Street
Richmond, VA   243219

*Counsel for Appellee*
*State of Virginia*

—————

OPINION

—————

VANASKIE, <u>District Judge</u>.

Appellant/Relator Edward Bogart ("Bogart") commenced this <u>qui</u> <u>tam</u> litigation on behalf of the United States, the District of Columbia, and ten states with <u>qui</u> <u>tam</u> legislation.[1] Appellees King Pharmaceuticals and Monarch Pharmaceuticals

—————————————

[1]"<u>Qui</u> <u>tam</u> is short for '<u>qui</u> <u>tam</u> <u>pro</u> <u>domino</u> <u>rege</u> <u>quam</u> <u>pro</u> <u>se</u> <u>ipso</u> <u>in</u> <u>hac</u> <u>parte</u> <u>sequitur</u>,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" <u>Rockwell Int'l Corp. v. United States</u>, 127 S. Ct. 1397, 1402 n.2 (2007).

(collectively, "King") ultimately settled the claims of the jurisdictions with qui tam statutes, and Bogart was paid counsel fees and expenses of approximately $800,000, plus relator fees in excess of $9 million. King also entered into settlement agreements with the nearly 40 States without qui tam legislation who were not parties to this case. Contending that his efforts produced settlements totaling more than $30 million for the non-qui tam States, Bogart unsuccessfully argued in the District Court that he was entitled to be paid up to one-third of that amount as attorneys' fees under a common fund theory of recovery. He has appealed the District Court's ruling. Finding no merit in Bogart's contentions, we will affirm the District Court.

# I

On March 12, 2003, Bogart commenced a qui tam action against King under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732.[2] He also asserted claims on behalf of ten states and the District of Columbia that had statutes similar to the FCA, seeking a relator's share and attorneys' fees under these

---

[2]The FCA authorizes private individuals to bring claims in the name of the United States to recover for alleged false or fraudulent claims submitted for payment to the United States. 31 U.S.C. § 3730(b)(1).

statutes as well.[3]  Bogart, a former employee of King, alleged that King misrepresented pricing information it supplied to the federal and state governments as a condition of its participation in various Medicaid programs.

Bogart filed amended complaints on July 1, 2003, and June 17, 2004, to assert claims on behalf of Appellee Virginia and New Mexico, respectively, which had recently enacted false claims statutes.  In accordance with the FCA, the original complaint and the amended complaints were filed under seal.

At the time Bogart filed the second amended complaint, the United States permitted notification to the qui tam States of this litigation.  Bogart was also permitted to notify the National Association of Medicaid Fraud Control Units ("NAMFCU"), an association of state attorney general offices that coordinates interstate efforts to prosecute Medicaid fraud claims

After notice of this lawsuit, the NAMFCU formed a committee to negotiate a settlement with King on behalf of its members, many of whom did not have qui tam statutes and were not parties to this litigation.  Each state individually negotiated with King as well.  Bogart did not participate in these settlement discussions.

---

[3]The ten states were California, Delaware, Florida, Hawaii, Illinois, Louisiana, Massachusetts, Nevada, Tennessee, and Texas.

On September 22, 2004, in anticipation of impending settlements, Bogart filed a Third Amended Complaint, asserting a request for "Common Fund Relief" with respect to amounts recovered by non-qui tam jurisdictions. In Paragraph 221 of the Third Amended Complaint, Bogart asserted:

> While the states possessing qui tam statutes have a regulatory scheme for rewarding the Relator for coming forward, those which have none will potentially receive a windfall with little or no investigation or commitment of time or resources to the recovery. The Common Fund doctrine preserves the right of the litigant or counsel to an award from the Common Fund generated.

Bogart sought recovery of up to one-third of the purported common fund, although he did not specify whether this percentage represented a relator's share or counsel fees.

On October 31, 2005, the United States, the States, and King announced an aggregate settlement of $124,057,318. Of this amount, $73,420,225 was payable to the United States; $20,239,317 was payable to the qui tam States; and $30,397,776 was payable to the non-qui tam States. Bogart did not participate in the negotiation of the settlements and was not a party to any of the settlement agreements.

King executed separate settlement agreements with the United States and each individual state. Although the Federal Settlement Agreement noted that King agreed to pay the States $50,637,093, the agreement explicitly stated that King's obligation to pay the United States was independent of King's settlement agreements with the individual States, and that "King's obligation to pay the State Settlement Amount . . . shall arise only under the NAMFCU Agreement and the State Settlement Agreements."

On October 30, 2005, one day before the announcement of the settlements, Bogart moved for emergency injunctive relief to restrain King from making any payments pursuant to the settlement agreements. Among other things, Bogart alleged that he would be irreparably harmed if King paid the non-qui tam settlements – the so-called "common fund" – because the District Court would no longer have jurisdiction to provide from the settlement amounts what Bogart contends are his legal entitlements.

On October 31, 2005, the District Court denied Bogart's motion for a temporary restraining order. The court deferred consideration of Bogart's preliminary injunction motion until after the completion of pertinent discovery.

On December 20, 2005, Bogart filed his First Amended Petition for Fees, claiming that he was entitled to one-third of the aggregate settlement proceeds payable to the non-qui tam

9

States under the common fund doctrine. Though one might conclude that, given its title, the petition was for counsel fees, Bogart once again failed to specify within the submission whether this percentage constituted a relator's share or counsel fees. The Amended Petition, however, stated that King had agreed to pay all fees and expenses to which Bogart was entitled under the FCA fee-shifting provision, 31 U.S.C. § 3730(d)(1).[4]

The District Court addressed Bogart's claim for relief under the common fund doctrine in connection with its decision on a motion to dismiss filed by New Mexico, one of the two States Bogart added to this case in amended complaints. United States ex rel. Bogart v. King Pharms., 410 F. Supp. 2d 404 (E.D. Pa. 2006). New Mexico argued that its false claims statute did not apply because King's alleged fraudulent activity had ended

---

[4]King paid Bogart approximately $800,000 in full satisfaction of his attorneys' fees claim. Bogart noted in his First Amended Petition for Fees that the amount King agreed to pay pursuant to 31 U.S.C. § 3730(d)(1) did not "include services performed with respect to Relator share issues and post-fairness hearing motion practice." (App. 1137 n.3.) He also asserted, however, that he "did not compromise on the amount of his statutory entitlement to fees, costs and expenses with King." (Id.) It thus appears that the fees and expenses incurred by Bogart in connection with the prosecution of the qui tam claims were paid by King. In this regard, Bogart represented that he had "committed, approximately, $800,000 of attorneys' time and expense . . . which resulted in [the] settlement." (Id. at 1035.)

10

before New Mexico's false claims statute went into effect on May 19, 2004. The District Court agreed that the statute could not apply retroactively and dismissed the claim under the New Mexico False Claims Act.[5] Id. at 408.

Bogart argued alternatively that he was entitled to a share of New Mexico's settlement under the common fund doctrine. In a well-reasoned opinion, the District Court concluded that the common fund theory of recovery did not apply. Id. at 409-10. The court noted that the common fund doctrine has never been applied in a qui tam action, but rather its application has been limited to a narrow range of situations involving "trust law, class actions and insurance subrogation." Id. Moreover, the District Court was not persuaded by Bogart's arguments that the common fund doctrine should apply in this instance. First, the District Court concluded that a common fund did not exist because the United States, the qui tam States, and the non-qui tam States negotiated and executed "separate and severable" settlement agreements with King. Id. Second, the primary consideration of the common fund doctrine – to avoid inequity that results where one party bears the cost of litigation that benefits others – was not implicated because New Mexico and

---

[5]Virginia also moved to dismiss its claim against King on the same grounds asserted by New Mexico. In light of the District Court's determination as to New Mexico, Bogart did not oppose Virginia's motion to dismiss. Virginia, like New Mexico, is effectively a non-qui tam State.

the non-qui tam States retained their own counsel to negotiate and execute the settlement agreements with King, and Bogart's fees and expenses had been paid by King.  Finally, the District Court reasoned that Bogart's request for litigation costs under the common fund doctrine was simply a veiled attempt to obtain a reward for providing information about King to States that have declined to authorize payment of relator fees.  Id.  In this regard, the court observed that granting Bogart's request would effectively impose qui tam statutes on sovereign state governments that have decided against such legislation.  Id. at 409-10.  Therefore, the District Court denied Bogart's request for common fund relief as to New Mexico, and later incorporated this opinion into an Order denying Bogart's request as to the remaining non-qui tam States.[6]  (See App. 22.)

On March 3, 2006, the qui tam States, King, and Bogart filed a Joint Stipulation of Dismissal and Order, acknowledging the dismissal of the qui tam States' claims against King and the resolution of all of Bogart's claims, "with the exception only of his claim to a share from Virginia and the [non-qui tam States] under the so-called 'Common Fund Relief' as asserted in paragraph 221 of the Plaintiff's Third Amended Complaint." (App. 1066.)  King thereafter satisfied its obligations to the States under the State Settlement Agreements and the NAMFCU

---

[6]New Mexico has settled Bogart's claim for attorneys' fees. Virginia, however, refused to pay any amount to Bogart, and thus remains a party to this case.

12

Agreement.  On March 15, 2006, the District Court entered a final judgment, dismissing "[a]ll claims and counts, including but not limited to, common fund allegations against all states without qui tam statutes."  (Id. at 25.)  This timely appeal followed.

## II

### A.

We have jurisdiction over Bogart's appeal pursuant to 28 U.S.C. § 1291.  This Court reviews the District Court's decision whether to award attorneys' fees for abuse of discretion, but exercises plenary review over the lower court's application of legal standards in making that determination.  Brytus v. Spang & Co., 203 F.3d 238, 244 (3d Cir. 2000).

### B.

Under the "American Rule," litigants generally must bear their own attorneys' fees.  Id. at 241-42.  The common fund doctrine is an exception to this rule.  It "'provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.'"  In re Cendant Corp. Sec. Litig., 404 F.3d 173, 187 (3d Cir. 2005) (quoting In re Gen. Motors. Corp.

13

Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820 n.39 (3d Cir. 1995)).

The Supreme Court first recognized the common fund doctrine in Internal Improvement Fund Trs. v. Greenough, 105 U.S. 527 (1881), a case involving a bondholder's successful lawsuit on behalf of himself and other similarly situated bondholders. The Court held that the plaintiff, who incurred the entire expense of the litigation, was entitled to an award of fees from the common fund because it would be inequitable to allow the other bondholders to share in the recovery without "contribut[ing] their due proportion of the expenses." Id. at 532. We have also recognized the common fund doctrine. See, e.g., Cendant, 404 F.3d at 187; Gen. Motors Corp., 55 F.3d at 820, 822.

The common fund doctrine is equitable in nature, intended to avoid unjust enrichment at the expense of the successful litigant. Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). The doctrine operates to charge an award against the fund itself, rather than to impose personal liability against a party or beneficiary. See In re Smithkline Beckham Corp. Sec. Litig., 751 F. Supp. 525, 531 (E.D. Pa. 1990); In re DN Assocs., 165 B.R. 344, 348 n.14 (Bankr. D. Me. 1994).

In Boeing Co., the Supreme Court explained that "[j]urisdiction over the fund involved in the litigation allows a court to prevent . . . inequity by assessing attorney's fees

14

against the entire fund, thus spreading fees proportionately among those benefited by the suit." 444 U.S. at 478 (emphasis added). Application of the common fund doctrine thus requires court "control over a fund or jurisdiction over the parties. . . ." Vincent v. Hughes Air West, Inc., 557 F.2d 759, 774 n.15 (9th Cir. 1977).

Asserting that this is a "classic" common fund case, Bogart contends that the District Court had control over the non-qui tam States' settlement proceeds based upon its responsibility to approve King's settlement with the United States. See 31 U.S.C. § 3730(c)(2)(B). Bogart claims that the District Court's power to approve the Federal Settlement Agreement gave it control over the non-qui tam States' settlement agreements because (1) the Federal Settlement Agreement referred to the aggregate settlement amount and the portion thereof allocated to the States, and (2) the States could not receive payment before the United States was paid.

Neither fact, however, shows that the non-qui tam States' settlements were under the District Court's control or subject to its approval. To the contrary, the Federal Settlement Agreement expressly stated that "King's obligation to pay the State Settlement Amount [of $50,637,093], or any individual State's share thereof, shall arise only under the NAMFCU Agreement and the State Settlement Agreements." (App. 282 (emphasis added).) There is nothing in the settlement agreements executed by the non-qui tam States that would indicate they were subject

15

to District Court approval or control. The District Court thus lacked control over the purported "common fund."

Nor did the District Court have jurisdiction over the non-qui tam States. Indeed, Bogart does not argue to the contrary. Bogart does contend, however, that the District Court's jurisdiction over King allowed it to award common fund relief, even though the non-qui tam States were not participants in this litigation, because King was the party responsible for making payments to the non-qui tam States. Bogart, however, has not cited any authority that holds that jurisdiction over the defendant, alone, is sufficient to confer authority to grant common fund relief. Consequently, because the District Court did not have jurisdiction over the fund or the non-qui tam States, it lacked the authority to award common fund relief from the non-qui tam States' settlement proceeds.

Even if the District Court had such authority, an award to Bogart would be inappropriate. First, we agree with the District Court that Bogart's litigation did not create a common fund. In the "classic" common fund case, like a class action, the litigation generates a pool of money, either through a judgment or settlement, to which the beneficiaries are entitled to claim a portion. See, e.g., Boeing Co., 444 U.S. at 479, 481; Greenough, 105 U.S. at 529; Wininger v. SI Mgmt. L.P., 301 F.3d 1115, 1120 (9th Cir. 2002). In this matter, there was no pool of money generated to which the non-qui tam States had a claim. Instead, each non-qui tam State separately negotiated a

16

settlement agreement with King. While Bogart argues that the $30,397,776 paid to the non-qui tam States constitutes the common fund, this figure only represents the sum of the separately negotiated and independent settlements between King and the non-qui tam States. As the District Court observed, "[t]he mere fact that a large number of parties has reached such settlements does not mean that the sum of the settlement amounts somehow constitutes a common fund in the manner of a class action award." Bogart, 410 F. Supp. 2d at 409. Cf. United States ex rel. Merena v. SmithKline Beecham Corp., 52 F. Supp. 2d 420, 440 (E.D. Pa. 1998) (calculating relator's share under 31 U.S.C. § 3730(d) based upon the amount received by the United States exclusive of the amounts received by the states pursuant to separate settlement agreements), rev'd on other grounds, 205 F.3d 97 (3d Cir. 2000).

Bogart contends that the District Court took an impermissibly narrow view of what constitutes a "common fund." (Appellant's Br. 32-34.) None of the cases cited by Bogart, however, involves circumstances similar to those presented here. For instance, In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 295-96 (3d Cir. 1998), involved a class action settlement in which the defendant agreed to pay a set amount in counsel fees in addition to a base amount of $410 million to resolve claims through a streamlined alternative dispute resolution process. At issue in Prudential was the valuation of claims to be pursued through the ADR process plus the valuation of other aspects of the settlement.

17

Significantly, the attorneys' fees were not payable from the funds to be paid or monetary benefits provided to class members. The purpose of assessing the value of the settlement was to determine the reasonableness of the $90 million fee Prudential had agreed to pay. Moreover, we questioned the propriety of including in the valuation those claims that would be pursued under a plan that had been put into place separate and apart from the settlement, observing:

> While a party need not be the only catalyst in order to be considered a "material factor" and may be credited for extra-judicial benefits created, there must still be a sound basis that the party was more than an initial impetus behind the creation of the benefit. Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund . . . .

Id. at 337.

By way of contrast to the context in which Prudential was decided, this case is not a class action, does not involve an assessment of the reasonableness of a fee the defendant has agreed to pay in addition to the amount to be recovered by claimants, and does not involve a settlement negotiated by the attorneys seeking recovery of a fee under common fund

18

principles. Instead, this case presents an attempt by Bogart's counsel to recover substantial fees from settlements negotiated independently by non-qui tam States who, with the exception of Virginia, are not parties to this litigation. Although Bogart may have been the "impetus for the creation of the benefits" to the non-qui tam States, he has shown nothing more that would make recognition of a common fund appropriate here.

In Puerto Rico v. Heckler, 745 F.2d 709, 711 (D.C. Cir. 1984), another case cited by Bogart, the Court of Appeals for the District of Columbia Circuit approved a fee award under the common fund doctrine where the judgment expressly provided for the recovery by non-party beneficiaries. In other cases cited by Bogart, the efforts of counsel had created binding precedent entitling the non-party beneficiaries to recover under principles of stare decisis. See Sprague, 307 U.S. at 166; cf. City of Klawock v. Gustafson, 585 F.2d 428, 431 (9th Cir. 1978) (administrative policy change attributable to litigation efforts may support common fund relief).

Bogart's litigation did not create a legal entitlement on behalf of the non-qui tam States. Significantly, but for the negotiated settlement agreements between the non-qui tam States and King, the only recourse available to the non-qui tam States would have been to commence litigation on their own. Accordingly, Bogart and his attorneys did not create a common fund for the benefit of the non-qui tam States.

Another reason for denying common fund relief in this case is there is no inequity that needs redress. Bogart's fees and expenses attributable to prosecution of the FCA claims were paid in full by King. Where, as here, someone other than the plaintiff ultimately bears the costs of litigation, there is no inequity to redress because, irrespective of whether the non-party beneficiaries are unjustly enriched, it is not at the expense of the plaintiff. See Brytus, 203 F.3d at 245.

In Brytus, plaintiffs brought a class action lawsuit under the Employee Retirement Income Security Act of 1974 ("ERISA") that yielded a favorable judgment to the class of approximately $12.5 million. Id. at 240-41. Plaintiffs sought attorneys' fees under ERISA's statutory fee provision, 29 U.S.C. § 1132(g)(1), and plaintiffs' counsel sought an additional award under the common fund doctrine. Id. at 241. The district court granted attorneys' fees and expenses under ERISA, but denied the recovery of fees under the common fund doctrine because it determined an additional fee award was not warranted. Id. On appeal, this Court affirmed the district court's decision denying a fee award under the common fund doctrine. Discussing the Supreme Court's decisions in Greenough and Boeing, we noted that "the common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.'" Id. at 245 (quoting Boeing Co., 444 U.S. at 478). We determined that "there is no inequity to redress" because the defendant, rather than the plaintiffs, ultimately bore the entire

20

cost of litigation under ERISA's statutory fee provision. Id. at 246. "The class members may have been enriched, but their enrichment was not at the expense of either the litigating parties or their counsel." Id.

Though Brytus was an ERISA case, its reasoning justifies a similar conclusion in this matter. Under the FCA, Bogart was entitled to "reasonable attorneys' fees and costs," and "[a]ll such expenses, fees, and costs shall be awarded against the defendant." 31 U.S.C. § 3730(d)(1). Bogart and King filed a joint stipulation with the District Court whereby the latter agreed to pay the former $787,088.56 pursuant to 31 U.S.C. § 3730(d)(1). (App. 765.) While portions of the record indicate the attorneys' fees and expenses incurred by Bogart may have been higher, Bogart conceded in a subsequent filing with the District Court that he "committed, approximately, $800,000 of attorneys' time and expense and . . . effort which resulted in [a] settlement." (Id. at 1035.) Because King, rather than Bogart, ultimately subsidized this litigation, there is no inequity to redress. "The [non-qui tam States] may have been enriched, but their enrichment was not at the expense of [Bogart] or [his] counsel." Brytus, 203 F.3d at 246.

Finally, Bogart's request for litigation costs under the common fund doctrine is but a thinly-veiled attempt to obtain a reward for providing information about King from States that have declined to enact qui tam laws providing for such a reward. As the District Court observed:

21

To grant such request would pervert the intentions of states which have decided not to codify qui tam statutes, effectively requiring them to offer a higher award in qui tam actions than the federal government or other states who have chosen to pass such statutes.[5]

[5] The FCA allows a relator to recover up to twenty five percent (25%) of the final judgment or settlement against a defendant. 31 U.S.C. § 3730(d)(1). Ten of the 13 states with existing qui tam statutes have adopted this federal maximum. See § 740 ILCS 175/4(d)(1); Fla. Stat. § 68.085(1); Tex. Hum. Res.Code § 36.110(a); ALM GL ch. 12, § 5F(1); Tenn.Code Ann. § 71-5-183(d)(1)(A); 6 Del. C. § 1205(a); HRS § 661-27(a); Va.Code Ann. § 8.01-216.7(A); N.M. Stat. Ann. § 27-14-9(A). California and Nevada allow up to thirty-three percent (33%). See Cal. Gov.Code § 12652(g)(2); NRS § 357.210(1). Louisiana and the District of Columbia allow "not

> more than twenty percent" (20%).
> La. R.S. 46:439.4(A)(1); D.C.Code
> § 2-308.15(f)(1).
>
> Relator's extension of the common fund doctrine to the current context would essentially impose whistleblower reward statutes on 38 sovereign state governments that have decided not to enact them. As noted above, Relator would have this court impose the inequitable result of imposing a more severe liability on the non-qui tam states than the qui tam states, even though the non-qui tam states do not receive the statutory benefits of a qui tam statute, including service of the complaint and the opportunity to review and investigate. See 31 U.S.C. § 3730(b)(2). Whether or not it is prudent for state governments to reward whistleblowers, it is not the role of this court to say.

410 F. Supp. 2d at 409-10.

In summary, contrary to the assertion of Bogart's counsel at oral argument, this is not the "classic" common fund case. The District Court did not have jurisdiction over either the purported fund or the parties against whom Bogart directed his claim. Bogart did not participate in negotiating the settlements from which he claims a significant share. Bogart's counsel fees

23

and litigation expenses attributable to prosecution of FCA claims were paid by King. And finally, Bogart essentially seeks to recover a relator's fee from sovereign States that have not allowed such claims to be made against them. Under these circumstances, the District Court properly concluded that "application of the common fund theory cannot be justified in this case."[7] Id. at 410.

---

[7]We also reject Bogart's contention that, notwithstanding King's disbursement of the purported "common fund" pursuant to the settlement agreements, the payment of the settlements was improper in light of his claim to common fund relief. In this regard, Bogart, citing Savoie v. Merchants Bank, 84 F.3d 52 (2d Cir. 1996), argues that King is liable for its "'defiance of the law' in disbursing the full settlement amount to a party outside the court's jurisdiction." (Appellant's Br. 55.) Savoie, however, is readily distinguishable. There, the defendant bank disbursed the entire settlement amount of $9 million to its customers after a magistrate judge had issued a report and recommendation proposing that $500,000 of the settlement proceeds be held in escrow pending a determination as to whether plaintiffs' attorneys were entitled to a fee award under the common fund doctrine. Id. at 54. The defendant bank made the disbursement even before filing objections to the report and recommendation. Id. Unlike the defendant in Savoie, King did not disburse any settlement amounts in the face of injunctive relief recommended by a judicial officer, nor did King circumvent any applicable procedural rules in "defiance of the law." King made payment only after the District Court had (a) denied Bogart's motion for a temporary restraining order;

24

## III.

For the reasons stated, we will affirm the District Court.[8]

_____

_____

(b) denied Bogart's request for an award from the non-<u>qui</u> <u>tam</u> States under the common fund doctrine; and (c) approved the parties' joint stipulation of dismissal. At that point, King was legally obligated to make payments to the non-<u>qui</u> <u>tam</u> States, and the fact that Bogart's claim for common fund relief was still outstanding had no bearing on King's contractual obligations. Only a court order could impose a duty on King to withhold payment of the settlement amounts. <u>See</u> <u>Knight v. United States</u>, 982 F.2d 1573, 1580-81 (Fed. Cir. 1993). Therefore, we reject Bogart's contention that King is liable to him for payment of common fund relief.

[8]In light of our decision, it is unnecessary to consider the arguments presented by Virginia that the Eleventh Amendment and/or sovereign immunity preclude an award against it under the common fund doctrine.